## WEIR v. MORDEN.

*(Circuit Court, N. D. Illinois. August 4, 1884.)*

PATENT—IMPROVEMENT IN RAILROAD FROGS.
> The second claim of reissue patent No. 8,914 requires the point of the "frog" to be constructed as directed in the body of the patent. The U iron, as a mode of connecting the point and wing rails, was in public use and well known before the complainant claims to have been the inventor thereof.

In Equity.
*Wood & Boyd* and *Banning & Banning*, for complainants.
*Offield & Towle* and *H. Harrison*, for defendants.

BLODGETT, J. The complainant in this case seeks to restrain the infringement of reissue patent No. 8,914, issued to complainant, September 30, 1879, for "an improvement in railroad frogs," the original patent, No. 215,248, having been dated May 20, 1879. In his specifications complainant describes the mode of constructing his frog to consist in a peculiar mode of combining the rails so as to form the V-shaped point or angle of the frog, and also in connecting the point and the wing rails with channel iron, the upturned sides of which are bolted to the wing rails and the point rails.

The defendant is charged with infringing only the second claim of the patent, which is as follows:

> "(2) A frog composed substantially of two center rails, B, B¹, joined to form the V-shaped point, united to outside diverging or wing rails by means of two channel or U irons, D, D, one wing of which channel or U irons is shaped to fit the web of the abutting rails, combined to form the point of the frog, and upon the other side fitting the web of the wing or diverging rail respectively, and secured by bolts or rivets passing through the webs of the rails and the sides of the channel bars, substantially as shown."

The history of this patent, as gathered from the records in this case, seems to be this: In October, 1877, the complainant filed the application for his patent, and on December 2, 1877, the patent was allowed with certain claims; but, as he now insists, by the neglect of his solicitor, the final fee to the patent-office was not paid, and the proceedings to obtain the patent lapsed. Sometime in February, 1879, he renewed his application, and asked that the original specifications and drawings might be considered as part of the renewed application, and the original patent, No. 215,548, was issued May 20, 1879. On June 29, 1879, application was made for a reissue, which resulted in the reissue No. 8,914, now before the court.

Testimony has been put into the record by the complainant, as a witness in his own behalf, tending to show that he made the invention in question previous to June, 1876; but he is unable to define the time with any degree of certainty, except that on June 10, 1876, he exhibited a rough sketch or diagram of his proposed device to Mr. W. H. H. Allison, who affixed his name to said sketch at that date,

and who has testified to doing so, and the sketch is produced in evidence.

The defenses interposed are (1) that defendant does not infringe; (2) that the second claim of the reissue is void because it was not warranted by the original specifications nor the models; (3) that the device now claimed to be covered by the second claim of the reissued patent had been in public use more than two years before the complainant made his application for a patent.

The question of fact as to infringement depends upon whether the "two center rails, B, B¹, joined together to form the V-shaped point" mentioned in the second claim, necessarily mean the two center rails which are described in the specifications, or does it mean any center rails joined together in any manner to form a V-shaped point? The answer to this question seems to me to be found in the complainant's own specifications. He says:

"My invention consists—*First*, in such a formation and connection of the two rails which make up the angular point as that one of the rails extends unbroken and uncut across the path of the other, and in itself makes a solid end to the point, with a full length of flange, which is overlapped by the flange of the other rail, and thus the flange of double thickness is afforded at a point where strength is particularly needed, and the cutting away of the flanges, as is usually the custom, is avoided entirely."

In his description of the drawings he says:

"A, A¹, are the outer or wing rails of the frog, and B, B¹, are the two rails which compose the acute angle or point."

And in his description of the mode of constructing his device he says:

"In place of cutting away both the flanges between the two rails midway between the lines of the angle of the frog, as is common now, and, I may say, usually practiced, I continue the flange of the rail, B, of full width, intact, clear along the junction of the two rails to the point where it strikes the flange of the outer rail, as shown in figure 3, which is almost immediately under the point, X¹, of the frog, and I swage up the flange, B¹, of the rail, B¹, on one side, as shown in figures 5 and 3, so that it lies over the flange of rail, B; this flange of rail, B¹, being cut away angularly on the edge to properly meet the line of the web, B², of the rail, B."

It will thus be seen that minute directions are given as to the construction of the two center rails, B, and B¹, to form a V-shaped point, and I am of opinion that the two center rails, B, and B¹, described in the second claim, are the rails constructed and joined according to the description given in the patent. The language of the claim is, "The two center rails, B, B¹, join to form the V-shaped point," not any two center rails joined to form a V-shaped point. The V-shaped point made by extending one rail unbroken and uncut directly across the path of the other, and thereby making a solid end to the point, and with the flange of the rail, B¹, swaged up so as to lie upon or overlap the flange of the rail, B, seems to me to be an essential element of what complainant supposed he had invented, and therefore

the two center rails, B, B¹, mentioned in the second claim, refer to and mean the two center rails which he has particularly described in his specifications. The proof in the case wholly fails to show that the defendant forms the V-shaped point, in his frog, in the manner that complainant forms his point; indeed, the fact seems to be admitted that defendant does not form his points in the same manner described by complainant's specifications, and I understand the learned counsel for complainant to concede upon the hearing that, unless the second claim is held to include any V-shaped point joined to the wing rails by U irons, there is no infringement made out in this case. But, if I am wrong in my construction of this claim, the proof is conclusive that as early as September 13, 1876, railroad frogs, in which the point and wing rails were connected by channel irons or plates substantially as now constructed by the defendant were kept for sale and sold and put in public use on several railroads in this state; and the court will presume that in the due course of business it took at least some months before that time to devise and produce these frogs. The frogs thus sold were manufactured by the defendant, as he claimed, under patent No. 148,264, dated March 3, 1874, issued to George Thomas and William Miller, of which he, defendant, was owner, and under patent No. 173,804, dated February 22, 1876, issued to the defendant himself as the inventor. The Thomas and Miller patent shows a brace-plate which is but a narrow channel iron, the turned up edges of which were bolted to the wing rails, so as to stiffen the rails and keep them at their proper distance apart, while the Morden patent, of February 22, 1876, showed the wing rails or frogs connected by a U iron, or "trough-plate," as he calls it, the upturned sides of which "are made to conform to the curve of the side rails, as well as to the form of the neck and base of the rail, and are firmly secured to the neck of the rail by bolts or rivets." But instead of holding the V-shaped point in place by the use of channel iron or brace-plates, he provided a V-shaped recess in the channel, or trough-plate, into which the point of the frog was inserted and held; but the proof shows, in applying his device to crossings instead of switches, he used channel or V-shaped irons to connect the points and the wing rails, and the connection of his peculiar form of V-shaped point with the wing rails by means of the U irons, bolted or riveted to the web of the point and wing rails, is an element of complainant's device now in controversy. But, after Thomas and Miller had shown the use of their brace-plate, which, as I have said, is but a short channel iron, and after Morden had in February, 1876, showed the use of the V-shaped plate as a means of connecting the two outer rails, there would seem to be little room for invention, and it was only a mechanical application of the same device to apply the channel iron to hold the V-point in its proper place, instead of the recess which Morden adopted. In other words, when once the utility of the channel iron as a means for holding the wing

rails in their proper relations to each other was shown, there was no more invention in using it to hold the point in place, and strengthen the web of the point rails, than there was in using a bolt or rivet to fasten these channel irons to the rails; bolts and rivets being old. Morden adopted it as his mode of connecting the point and wing rails when the angle of the frog or crossing was so great as to make the recess in his trough-plate inapplicable.

I therefore conclude that the proper construction of the second claim requires the point to be constructed as directed in the body of the patent, and also that the U iron, as a mode of connecting the point and wing rails, was in public use and well known before complainant claims to have been the inventor thereof.

It may also, I think, be urged with much force, although it was not pressed in the argument, that the application for this patent must be deemed to have been first made at the time, and not before the time, when the renewed application was made, after the patent allowed in 1877 had elapsed; and, if this position is sound, there can be no doubt that Weir's device, precisely as he had constructed and used it, had been in public use for more than two years prior to his application. The application made by Weir in February, 1879, must, as it seems to me, be considered as his first application, the former application going for naught, and leaving him to stand upon that application as made at the time he renewed it, upon his old specifications and drawings.

The bill is dismissed for want of equity.