## WEIR v. MORDEN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 182. Argued February 13, 1888. — Decided March 19, 1888.

The second claim in reissued letters-patent No. 8914, dated September 30, 1879, to Frederick W. Weir, for an improvement in railroad frogs, (the original patent being No. 215,548, dated May 20, 1879,) whether construed by itself, or with reference to the state of the art at the time of the alleged invention, is a claim for a combination of parts, viz.: (1) two centre rails B B' joined to form the V-shaped point; (2) the outside diverging or wing rails; (3) the channel irons of a U shape uniting the centre rails together, and also to the outside or wing rails, so that the whole shall constitute a frog with the characteristics imparted by the features of this combination: and no invention was required to divide the U iron, shown in patent No. 173,804 issued to William J. Morden, February 22, 1876, into two, so as to connect the centre rails with the outer rail.

THIS was a bill in equity to restrain the alleged infringement of reissued letters-patent No. 8914, dated September 30, 1879, for an improvement in railroad frogs, the original patent, No. 215,548, dated May 20, 1879, having been issued on an

application filed February 4, 1879, to Frederick C. Weir, the complainant. In his specification the patentee described the invention generally as follows:

"My invention relates to the class of frogs made by the bending of the overlapping ends of the rails themselves, and the junction of the same with the central rail constituting the point by rivets or bolts through separating pieces; and my invention consists, first, in such a formation and connection of the two rails which make up the angular point as that one of the rails extends unbroken and uncut directly across the path of the other, and in itself makes a solid end to the point with a full-width flange, which is overlapped by the flange of the other rail, and thus a flange of double thickness is afforded at a point where strength is particularly needed, and the cutting away of the flanges (as is the usual custom) is avoided entirely; second, in an improved manner of connecting the two rails of the point together and to channel-iron pieces, to which the outer rails are connected.

"One of the objects of this invention is to furnish a firm lateral support upon each side of the V-shaped rails by means of channel irons, which at the same time unite and hold the centre rails forming the V to the wing rails firmly, uniting and holding all the parts in their proper relative position."

The drawings accompanying the specification were as follows:

The specification explained the drawings as follows:

"In the accompanying drawings Fig. 4 is a plan of a frog embodying my improvements. Fig. 5 is a cross-section of the same on line $xx$. Fig. 3 is a plan of the under side of the frog, showing the continuations of the main point rail with a full-width flange throughout, also showing the riveted extension of the flanges of the channel irons beyond the points.

"It will not be necessary to describe the devices shown in Figs. 1 and 2, as they are fully described in division B of this reissue.

"A A' are the outer or wing rails of the frog, and B B' are the two rails which compose the acute angle or point.

"In place of cutting away both the flanges, of the rails B B', so as to make a joint between the two rails midway between the lines of the angle of the frog, as is common now, and, I may say, usually practised, I continue the flange of the rail B, of full width, intact clear along the junction of the two rails to the point where it strikes the flange of the outer rail, as shown in Fig. 3, which is almost immediately under the point X' of the frog, and I swage up the flange $b^1$ of rail B' on one side, as shown in Figs. 5 and 3, so that it lies over the flange of rail B, this flange of rail B' being cut away angularly on the edge to properly meet the line of the web $b^2$ of the rail B.

"I connect the point rails B B' together by rivets, C, which, while they secure these rails together, also secure pieces of channel iron, D, to said point rails, the channel iron making the separating medium between the point rails B B' and wing rails A A' and giving a means for attaching said wing rails.

"The adjacent flanges of the channel irons of the point may be extended beyond the point and riveted, as shown in Fig. 3.

"With channel iron I attach the wing rails in the manner shown in Fig. 5, the outer flanges of the iron being notched at $d$ for the passage, before the outer rails are attached, of the long rivets C, the bolts E, which connect the outer rails, being placed between the notches $d$."

The claims were as follows :

"1.  A frog having one of its point rails extending with a full-width flange along the junction of the two rails, and the flange of the other point rail overlying the flange of the first-mentioned one, substantially as and for the purpose specified.

" 2.  A frog composed substantially of the two centre rails B B' joined to form the V-shaped point, united to outside diverging or wing rails by means of two channel or U irons, D D, one wing of which channel or U iron is shaped to fit the web of the abutting rails, combined to form the point of the frog, and upon the other side fitting the web of the wing or diverging rail, respectively, and secured by bolts or rivets passing through the webs of the rails and the sides of the channel bars, substantially as shown.

" 3.  In combination with the point rails B B', fitted to each other as described, the channel pieces D extending and bolted or riveted together beyond the point of the frog and connecting rivets C, which extend entirely through the two point rails and the channel pieces, substantially as and for the purpose specified."

The only claim involved in this suit was the second, no infringement being alleged of either the first or third.  Separate answers were filed by the defendants, respectively, which were, however, in substance the same.  The defences were that the reissued letters-patent were null and void, as not being for the same invention as set forth and described in the original letters-patent ; that the defendants did. not infringe ; and that the alleged invention of the complainant was not a patentable novelty, in view of the state of the art at the time of the alleged invention, as shown in certain prior letters-patent specifically mentioned.  The answer of Morden, adopted by the others, also set out the following :

" And this defendant, further answering, says, on information and belief, that he is the original and first inventor of a U-shaped plate in combination or connection with a railroad frog, and that said invention was secured to him by said letters-patent of the United States No. 173,804 and No. 205,-496, and that by virtue of said letters-patent he has the sole

and exclusive right to said U shape in a railroad frog, and that, while the complainant is engaged in the manufacture and sale of railroad frogs, he uses a V-shaped plate so secured to your defendant, as before stated, and in said manufacture and sale has copied from defendant's invention in substantial and material parts secured to defendant by his letters-patent aforesaid and in infringement of the same; and this defendant, in this connection, would state that prior to the filing of complainant's bill he, the defendant, filed a bill in this honorable court against said complainant for infringement of his said letters-patent No. 173,804 and said wrongful acts, and praying relief on account of said wrongful acts by the complainant, which said bill is now pending against him in this court. Some days after this defendant filed his bill as aforesaid, the said complainant filed his bill, seeking thereby, as defendant is advised and states, on information and belief, to harass and annoy defendant in his said suit and to delay accounting to defendant for said wrongful acts of him, the said complainant."

On final hearing a decree was rendered dismissing the bill for want of equity, to reverse which the present appeal was taken.

*Mr. E. E. Wood* (with whom was *Mr. Edward Boyd* on the brief) for appellant.

*Mr. Clarence A. Seward* filed a brief for appellant.

*Mr. Charles K. Offield* for appellees.

MR. JUSTICE MATTHEWS, after stating the case, delivered the opinion of the court.

The question of infringement depends upon the proper construction of the second claim. The proof shows that the defendants did not infringe either the first or the third. They did not form and connect the two rails, making up the angular point as a part of the frog, so that one of the rails would extend unbroken and uncut directly across the path of the

other, and in itself·make a solid end to the point with a full-width flange overlapped by the flange of the other rail, thus affording a double thickness and avoiding the cutting away of the flanges,·as was customary. If there is an infringement, it consists in the use of the channel irons of a U shape, uniting the two centre rails, forming the V-shaped point of the frog, to each other, and the two thus united to the two diverging rails on each side by means of bolts or rivets passing through the webs of the rails and the sides of the channel bars. The question was disposed of by the Circuit Court in favor of the defendants, as follows:

" The question of fact as to infringement depends upon whether the 'two centre rails B B' joined together to form the V-shaped point,' mentioned in the second claim, necessarily mean the two centre rails which· are described in the specification, or does it mean any centre rails joined together in any manner to form a V-shaped point? The answer to this question seems to me to be found in the complainant's own specification. He says: 'My invention consists, first, in such a formation and connection of·the two rails which make up the angular point as that one of the rails extends unbroken and uncut directly across the path of the other, and in itself makes a solid end to the point with a full-width flange, which is overlapped by the flange of the other rail, and thus a flange of double thickness is afforded at a point where strength is particularly needed, and the cutting away of the flanges (as is the usual custom) is avoided entirely.'

" In his description of the drawings he says:

" ' A A' are the outer or wing rails of the frog, and B B' are the two rails which compose the acute angle or point.'

" And in his description of the mode of constructing his device he says:

" ' In place of cutting away both the flanges of the rails B B', so as to make a joint between the two rails midway between the lines of the angle of the frog, as is common now and, I may say, usually practised, I continue the flange of the rail B, of full width, intact clear along the junction of the two rails to the point where it strikes the flange of the outer rail,

as shown in Fig. 3, which is almost immediately under the point X′ of the frog, and I swage up the flange $b^1$ of rail B′ on one side, as shown in Figs. 5 and 3, so that it lies over the flange of rail B, this flange of rail B′ being cut away angularly on the edge to properly meet the line of the web $b^2$ of the rail B.'

" It will thus be seen that minute directions are given as to the construction of the two centre rails B and B′ to form a V-shaped point, and I am of opinion that the two centre rails B and B′, described in the second claim, are the rails constructed and joined according to the description given in the patent. The language of the claim is, 'the two centre rails B B′ joined to form the V-shaped point,' not any two centre rails joined to form a V-shaped point. The V-shaped point made by extending one rail unbroken and uncut directly across the path of the other, and thereby making a solid end to the point, and with the flange of the rail B′ swaged up so as to lie upon or overlap the flange of the rail B, seems to me to be an essential element of what complainant supposed he had invented, and, therefore, the two centre rails B B′ mentioned in the second claim refer to and mean the two centre rails which he has particularly described in his specification. The proof in the case wholly fails to show that the defendant forms the V-shaped point in his frog in the manner that complainant forms his point."

The construction of the second claim contended for by the appellant is, that it embodies separately and distinctly that part of the invention which, in the general description in the preliminary part of the specifications, is stated to be " an improved manner of connecting the two rails of the point together and to channel-iron pieces, to which the outer rails are connected," without reference to the manner in which the two rails of the point are formed, so as to constitute the first part of the invention. If this construction be admitted, the second claim would cover every case of two centre rails joined to form the V-shaped point, which were united to outside diverging or wing rails by means of channel irons of a U shape, bolted or riveted, as therein described, without reference

to the manner in which the two centre rails were combined to make the angular point or V shape. In our opinion, the construction placed upon this claim by the Circuit Court is right, and is required by the language of the specifications and claim. The claim does not on its face profess to cover a mere mode of connecting, by means of U-shaped channel irons, the intermediate with the external rails. It is in form a claim for a combination of parts, which together constitute a frog of peculiar construction. The elements of that combination, as stated in the claim, are, first, the two centre rails B B' joined to form the V-shaped point; second, the outside diverging or wing rails; third, the channel irons of a U shape uniting the centre rails together, and also to the outside or wing rails, so that the whole shall constitute a frog with the characteristics imparted by the features of this combination. This coincides with the statement contained in the brief of counsel for the appellant, who say, speaking of the invention as described in the second claim:

"The elements constituting the invention in controversy are: First, two outside diverging wing and main rails; two inside V-shaped point rails, the four rails being united and joined together by two channel irons bolted to these rails by three lines of rivets or bolts, to wit: one line of bolts, bolting one channel iron to one wing rail; another line of bolts, bolting another channel iron to the other outside wing rail; and the third line of bolts passing through the two inside wings of the two channel plates, and through the webs of the point rails, thereby making one structure or machine. In this construction the cut-away rail forming the point is reinforced on each side by the vertical wings of the channel irons. The claim is for this frog or machine so constructed, a frog composed substantially of the elements above named."

The claim refers specifically to the "two centre rails B B' joined to form the V-shaped point." This points explicitly to the drawings, on which the two centre rails are designated by the letters, and also to the mode in which they are shown by the drawings and the description in the specification to be joined, and excludes the idea of constructing a frog, such as is

intended to be covered by the second claim, of any other centre rails than those thus pointed out and described. The patentee by this mode of description and of claim has made the centre rails, formed and connected in the manner described to make up the V-shaped point, an essential part of the invention intended to be secured by the second claim.

An argument against this construction, made by the counsel for the appellant, is based upon the language of the third claim. That claim is for the channel pieces D extending and bolted or riveted together beyond the point of the frog and connecting rivets C, which extend entirely through the two point rails and the channel pieces, "in combination with the point rails B B', fitted to each other as described." It is admitted that the language of that claim limits it to the point rails formed and connected together so as to make the V-shaped point, according to the specific manner described in the specification and shown in the drawings, and that it does not cover centre rails of any other description. This limitation is based upon the words "fitted to each other as described." It is argued that as this phrase is omitted from the second claim, the contrary inference must prevail, so that that claim may be permitted to extend so as to embrace all centre rails joined to form the V-shaped point, however they may be fitted to each other. But this variation of language does not seem to us so significant. The second claim, by the use of the phrase at its close, "substantially as shown," limits its application quite as effectually to the particular kind of centre rails described in the specification and covered by the first claim; and the reference therein to "the two centre rails B B' joined to form the V-shaped point," can only mean such point rails as are shown in the drawings marked B B', and joined to form the V-shaped point referred to in the drawings and described in the specification "substantially as shown."

If this construction of the second claim needed corroboration, that would be found in the state of the art at the time of the alleged invention, as shown by the proof in the present case. The frogs exhibited in evidence as infringements of the complainant's patent were manufactured by the defendants, as

they claimed, under patent No. 148,264, dated March 3, 1874, issued to George Thomas and William Miller, under whom they claim, and also under patent No. 173,804, dated February 22, 1876, issued to Morden, one of the defendants, as inventor. Morden's patent of February 22, 1876, showed a connection of the wing rails for use as frogs by means of a U-iron or "trough plate," the upturned sides of which "are made to conform to the curve of the side rails, as well as to the form of the neck and base of the rails, and are firmly secured to the neck of the rails by bolts or rivets." Instead of holding the V-shaped point in place by the use of channel irons, he provided a V-shaped recess in the channel or trough plate into which the point of the frog was inserted and held; but in applying his device to railroad crossings instead of switches, he used channel or U-shaped irons to connect the points and wing rails. It is true, as suggested by counsel for the appellant, that a crossing of railroad tracks is a very different device from a switch, where the latter is used by means of a frog to shift the engine and train from one line of tracks to another; but the use of channel irons is analogous in the two cases, and it would require no more than ordinary mechanical skill to transfer the channel irons used upon a crossing to firmly hold the parts in place, to a similar use in a frog to unite firmly in their respective positions the centre rails with the exterior rails.

Independently, however, of this use of channel irons on crossings, we think that the patent to Morden of February 22, 1876, for an improvement in railroad frogs, considered in itself, leaves no room for invention in the application of channel irons in uniting the V-shaped point rails with the exterior rails. In that patent the invention consisted in forming a metallic plate into a U-shaped trough for the purpose of connecting the outer rails, leaving the V-shaped ends of the point rails to be secured by means of a V-shaped recess in the bed of the plate at the wide end of the trough. There seems to be no invention in dividing that trough into two, so as to connect the centre rails on each side, by means of a separate channel iron or U-shaped trough, with the outer rail exterior to them.

For these reasons the decree of the Circuit Court is

*Affirmed.*