DETROIT IRON & STEEL CO. v. CAREY.

(Circuit Court of Appeals, Sixth Circuit. October 13, 1916.)

No. 2883.

1. PATENTS ⊕⏌78—PERSONS ENTITLED TO PATENTS—PRIOR USE.
Where an applicant for a patent fails to pay the final fee within six months after its allowance, a renewal application made within two years, as permitted by Rev. St. § 4897 (Comp. St. 1913, § 9443), is to be deemed merely a continuance of the first, which under the statute has been held in abeyance, and the two years' prior public use which will defeat the right to the patent is to be reckoned from the date of the original application.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 99, 100; Dec. Dig. ⊕⏌78.]

2. PATENTS ⊕⏌328—VALIDITY AND INFRINGEMENT—CONCRETE DOCK.
The Ferguson patent, No. 1,089,405, for a reinforced concrete dock, was the invention of the patentee, and discloses patentable invention; also held infringed.

3. PATENTS ⊕⏌226—SUIT FOR INFRINGEMENT—DELAYED ISSUE OF PATENTS.
Rev. St. § 4897 (Comp. St. 1913, § 9443), provides that an applicant who has failed to pay the final fee after allowance of his patent may file a new application therefor within two years, "but no person shall be held responsible in damages for the manufacture or use of any article or thing for which a patent was ordered to issue under such renewed application prior to the issue of the patent." Held, the latter provision only prevents recovery of damages accruing previous to the issue of patent, and not a remedy by injunction and damages if the use is continued subsequent to issue.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 357; Dec. Dig. ⊕⏌226.]

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit in equity by James D. Carey against the Detroit Iron & Steel Company. Decree for complainant, and defendant appeals. Affirmed.

G. B. Marty and C. R. Miller, both of Cleveland, Ohio, for appellant.

A. L. Lawrence, of Cleveland, Ohio, for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SESSIONS, District Judge.

KNAPPEN, Circuit Judge. Suit for infringement of patent No. 1,089,405 to plaintiff, as assignee of Ferguson, for improvements in reinforced concrete docks or piers. Defendant denies the validity of the patent, as well as liability to decree for infringement. The district court held the patent valid and infringed. The appeal is from this decree.

⊕⏌For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

[1] 1. The original application for patent was filed March 5, 1909. It was allowed March 21, 1911. The final fee not being paid within six months, renewal application was filed on November 1, 1912, as permitted by Rev. St. § 4897. The patent issued March 10, 1914. June 15, 1907, public use was begun by the Cleveland Furnace Company of a dock constructed by plaintiff's company according to the invention of the patent, and January 1, 1910, like public use by defendant was begun of a dock also built by plaintiff's company according to the same invention. Each of these uses began more than two years before the renewal application, but neither was begun more than two years before (one being after) the original application.

Defendant contends that such prior public use defeats the patent. The pivotal question upon this branch of the case thus is whether the two years public use is to be reckoned from date of the original application or from that of the renewal application. The answer to this question depends upon whether the first application is regarded in law as "forfeited" or "abandoned" after the lapse of the six months period, and the second application in effect a new application, or whether the original application is merely held in abeyance pending the lapse of the two years, and the second application thus a continuance of the first.

The rule previous to the statute was well settled that, where an application has not been abandoned, subsequent applications and amendments constitute merely a continuance of the original proceeding; and the two years public use or sale which avoids a patent must be reckoned from the time of the first application, and not from the filing of subsequent applications or amendments. Godfrey v. Eames, 1 Wall. 317, 17 L. Ed. 684; Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Graham v. McCormick (C. C.) 11 Fed. 859; Henry v. Francestown Co. (C. C.) Fed. Cas. No. 6,382. In Godfrey v. Eames, Smith v. Goodyear Co., and Henry v. Francestown, the original application was in each case rejected by the Patent Office, and a new application filed. In Graham v. McCormick (decided by Judge Drummond) the claims in controversy had been withdrawn from the original application and made the subject of a second application, patents issuing on each application. In each case it was held that the two years prior use must be reckoned from the date of the first application.

True, neither of these cases involved the statute here invoked; in the case of each of them the Patent Office proceedings antedated the statute. But that the aim of the statute was to preserve generally the rights of the inventor as of the time of his original application we think clearly appears from the history of the statute. The act of March 3, 1863 (12 Stat. 796, c. 102) provided that if the final fee were not paid within six months "the patent shall be withheld, and the invention therein described shall become public property, as against the applicant therefor." No period of grace for payment of the fee was provided. To remedy this harshness the act of March 3, 1865 (13 Stat. 533, c. 112), was passed, giving substantially the right con-

ferred by present section 4897 (printed in the margin of this opinion [1]), viz. a right on the part of any person in interest to make a second application within two years after the allowance of the original application. The amendments to the statute of 1863 have taken away the provision making the invention public property on failure to pay the final fee, and upon the filing of the second application the question of abandonment is expressly made one of fact. In the light of this history we must presume that Congress did not intend a rule less favorable to an inventor whose application had been allowed than to one whose application had been rejected, and who thereafter withdrew the same. On the contrary, the purpose of the existing statute was plainly "remedial, and to confer added privileges upon the inventor," as held by Commissioner Moore in Ex parte Lambert, 135 O. G. at p. 1583. By the statute the applicant is entitled as of right to a patent "for the asking at any time within two years" (Cutler v. Leonard, 31 App. D. C. at page 303), subject to the question of abandonment, which is not presumed but must be affirmatively shown (Cutler v. Leonard, supra; Saunders v. Miller, 33 App. D. C. 456, 468).

Our conclusion that the statute has not changed the previously existing rule, that the second application is deemed merely a continuance of the first, and that the two years statute must be reckoned from the date of the first application, is, we think, supported by the decisions both of the Patent Office and of the courts. In Ex parte Livingston, 20 O. G. 1747, 1749, Commissioner Marble seems to have held, in 1881, that a new application filed within two years after the first allowance is to be deemed merely a continuance of the first one, which is neither rejected nor abandoned, but simply held in abeyance. In Thompson v. Waterhouse (an interference proceeding) 30 O. G. 177, the second application was held, by Commissioner Butterworth, to be "in its nature like a motion or petition for the revival of a judgment that has become dormant." In Ex parte Lambert, supra, the application is spoken of as lying "dormant" during the eighteen months following the expiration of the six months provided for payment of fee. Sibbald v. Cassidy, 61 O. G. 1165, 1166, illustrates the liberality with which section 4897 is construed by the Patent Office.

In Ligowski Clay Pigeon Co. v. American Clay Bird Co. (C. C.) 34 Fed. 328 (decided by the late Judge Sage of this circuit), the

---

[1] "Sec. 4897. Any person who has an interest in an invention or discovery, whether as inventor, discoverer, or assignee, for which a patent was ordered to issue upon the payment of the final fee, but who fails to make payment thereof within six months from the time at which it was passed and allowed, and notice thereof was sent to the applicant or his agent, shall have a right to make an application for a patent for such invention or discovery the same as in the case of an original application. But such second application must be made within two years after the allowance of the original application. But no person shall be held responsible in damages for the manufacture or use of any article or thing for which a patent was ordered to issue under such renewed application prior to the issue of the patent. And upon the hearing of renewed applications preferred under this section, abandonment shall be considered as a question of fact."

applicant had failed to pay the final fee within six months, but had filed a new application within two years. It was held that the two years public use and sale must be reckoned from the date of the original application. True, the statute was not referred to, but it is not to be supposed that the learned judge overlooked it. This case is cited with approval in Walker on Patents (4th Ed.) § 147. It has also been cited in more than one decision with apparent approval. It has been frequently held that upon a second application under section 4897 the original application must be considered a reduction to practice, on the ground that the second application is merely a continuance of the first. Cain v. Park, 14 App. D. C. 42 (86 O. G. 797); Duryea v. Rice, 28 App. D. C. 423; Ex parte Luten, Commissioner's Decisions 1913, pp. 165, 168 (192 O. G. 990); Field v. Colman, 40 App. D. C. 598 (193 O. G. 221). And see Cutler v. Leonard, 31 App. D. C. at page 302; Henderson v. Kindervater, 203 O. G. 601. We think the principle upon which these holdings are based applies equally to the specific question we are considering.

In view of these considerations we think it clear that the right given by section 4897 to renewal applications, "the same as in the case of an original application," does not mean that the two years public use is to be reckoned from the renewal date; nor can such be the result of Patent Office rule No. 176, that the second application will not be regarded "for all purposes as a continuation of the original one." The rule itself makes certain limitations; perhaps there are others. We are cited to no persuasive holdings opposed to the conclusion we have reached. Judge Blodgett's somewhat obiter suggestion in Weir v. Morden (C. C.) 21 Fed. 243, 246, that the two years public use should be computed from the renewal application, was disregarded by the Supreme Court (125 U. S. 98, 8 Sup. Ct. 869, 31 L. Ed. 645), where the case was affirmed entirely upon other considerations.

Decisions to the effect that if the application has been abandoned under section 4894 (Comp. St. 1913, § 9438) for failure to prosecute seasonably after rejection, the two years public use is to be reckoned from the new application (Lay v. Indianapolis, etc., Co. [C. C. A. 7] 120 Fed. 831, 57 C. C. A. 313; Hayes-Young Co. v. St. Louis Transit Co. [C. C. A. 8] 137 Fed. 80, 82, 70 C. C. A. 1), have no application to renewal proceedings under section 4897, relating to allowed applications. Indeed, in the Hayes-Young Case it is expressly stated that where there has been no abandonment the two years public use and sale is to be reckoned from the presentation of the first application. In support of this proposition there are cited, among other decisions, Godfrey v. Eames, supra, Smith v. Goodyear Co., supra, Cain v. Park, supra, and Ligowski v. American Clay Bird Co., supra. The Hayes-Young and Lay Cases are in accord with Ex parte Livingston, supra, where it is held that a new application filed after the expiration of the two years (as under section 4894) is to be treated as new, and that the two years prior use runs from its date, although, as we have

seen, such is not the rule stated in Ex parte Livingston as to applications under section 4897.

The holding of Assistant Attorney General Hall (69 O. G. 639) that failure to pay the fee within six months worked a forfeiture or abandonment of the right to a patent seems to have been withdrawn as erroneous. Ex parte Lambert, supra, at page 1583.

In the instant case the record is barren of evidence tending to show abandonment of the invention of the patent in suit. The patent is, in our opinion, valid as against the defense of prior public use.

[2] 2. The primary purpose of the invention is the construction of an integral reinforced concrete dock, supported primarily by piling driven below the waterline, the reinforcing metallic elements to be so arranged as to sustain the various strains carried by it. A prominent feature is the reinforced concrete subfloor, which forms, with the dock wall, a continuous foundation for the dock, in which foundation the upper ends of the piles are imbedded, so distributing weight or shock over a series of piling. This subfloor is connected to a suitable shore anchorage, and is designed to carry, in whole or in part, the weights incident to the structure and its use, including filling or backing, as well as apparatus, cargoes, etc.; and through this subfloor, below the dock level, are to be transmitted to the shore anchorage, wholly or partially, strains or shocks from the waterside, thereby minimizing "any tendency toward the displacement of the dock." Economy in construction is also an object in view.

Fig. 1 of the patent drawings (reproduced below) illustrates in cross-section the dock of the patent as adapted to be built "closely adjacent to the shore line." The front wall is seen to be, in cross-section, in the form of a large reinforced concrete I-beam, having an overhanging portion on the water side (carrying a wooden bumper), the base resting upon a double row of piles, above which are laid reinforcing rods *1, 2,* embedded in the concrete. Integral with

Fig. 1.

the front wall is the reinforced concrete subfloor, also resting upon a double row of piles, and by means of rods *6, 7* and *8* anchored at the shore end to stay piles *s* and beams *s'*. It has also bracing walls *7'* between the front wall and the subfloor, within which are imbedded metal ties in the form of tension members, extending from the top of the wall to the shore anchorage. The front wall is shown reinforced with rods *3-3* distributed throughout the structure, and the subfloor is reinforced by tension rods *4* and suspension or sheer members *5,* as well as rods *5'* within

the upper portion of the floor and adjacent to the front wall, to meet "negative or binding strain."

Fig. 2 requires no mention. Of Fig. 3 it is enough to say that it illustrates a supporting of the rear portion by anchorage piers instead of stay piling and beams. Fig. 4 (also here reproduced) illustrates in cross-section a portion of a dock similarly constructed, designed for extending "over indefinite areas, and at a distance into the water, or over marshy ground and the like," the shoreward section with which it is intended to be provided not being shown.

Defendant contends that Ferguson was not the inventor of the alleged improvement, and that the patent is void because its subject-matter was known to the Cleveland Furnace Company and others before Ferguson's alleged invention. The Osborn Engineering Company represented the Cleveland Furnace Company in the obtaining of plans for the dock built by plaintiff's company, before referred to. We are satisfied that the Carey Company's plan, according to which the dock was built, embraced the invention of the later patent. Before the Carey Company's plan was finally accepted, the Osborn Company had submitted a plan of its own, which defendant urges embodied the alleged invention and antedated Ferguson's conception.

The Osborn plan showed a reinforced concrete structure resting on piles, with concrete embracing their upper ends, an overhanging portion formed on the wall carrying a wooden bumper, together with bracing walls on the shoreward side. It had, however, no concrete subfloor. The floor back of the girder wall was to consist of a wooden beam bolted to the piles at its front end, the rear end being bolted to upright timbers, to which also anchor bolts extended from mooring posts on top of the girder. It is insisted that there was no invention in substituting a reinforced concrete floor for the proposed Osborn wooden floor, or in place of an alleged nonreinforced concrete floor of Hennebique (thought to be disclosed by publication), in view of the lack of novelty in the use of timber piles for supporting concrete construction surrounding their heads, as well as of Mouchel's reinforced concrete dock patent. Of the Hennebique disclosure it is enough to say that it is not a dock, but a reinforced concrete retaining wall with pile foundations, and, so far as disclosed by publication, shows nothing which can properly be likened to the subfloor of the patent in suit. Mouchel's construction embraced piles formed of or encased in reinforced concrete. It does not disclose the invention of

236 F.—59

the patent in suit, including the loaded subfloor forming, with the dock wall, a continuous foundation for the dock. Indeed, Mouchel's piling constitutes its only front "wall."

Respecting the Osborn plan: Assuming that there would be no invention in substituting a concrete floor for the timber floor merely as a floor, yet the subfloor of the patent is not merely a floor, but is a part of an integral construction embracing girder and base and concrete bracing walls, strengthened by reinforcing which forms a continuous connection from the front of the girder to the anchorage in the rear, so greatly increasing the strength and stability of the dock. This function the proposed Osborn floor, having in view the method of its construction and attachment to the front portion of the dock, could not as completely perform.

But apart from these considerations, we are satisfied that Ferguson did not get his idea from the Osborn plans. He has carried his invention back prior to July 10, 1906, at which time he submitted his first plan for the Furnace Company's dock, antedating the Osborn plan (Aug. 16, 1906); Ferguson's latest plan (dated Aug. 29, 1906) being the one accepted by the Furnace Company, and approved by the Osborn Company over its own. True, the drawings of Ferguson's earliest plan do not show a subfloor in use for carrying purposes, but the rear end was "to be made to suit conditions at site," and it satisfactorily appears, as we understand the record, that Ferguson's plan was intended from the first to have a subfloor carrying a fill, the shore side to carry a locomotive and train of cars.

We think the defense that Ferguson was not the real inventor is not made out. It seems scarcely necessary to say that the knowledge of the Osborn Company's plan obtained by those to whom it was submitted in connection with the obtaining of plans for the Furnace Company's dock cannot invalidate the patent.

3. The claims in suit are Nos. 4, 6, 10, 11, 12 and 16, which we print in the margin.[2] Defendant contends that these claims, as limited by

[2] "4. A concrete dock comprising a base, a front wall integral with said base, an overhanging portion formed on said wall, spaced webbed portions connecting said overhanging portion with the base, metallic rods passing through said overhanging portion and the webbed portions, metallic rods passing through the front wall and said overhanging portion, and means for anchoring said base and wall to the shore, substantially as set forth."

"6. In a concrete dock, the combination with rows of piles driven substantially to the water level, of metallic reinforcing members, extending across said piles, a concrete wall erected thereon, and embracing said reinforcing members within its base, additional reinforcing members embedded adjacent to the upper front and rear portions thereof in approximately a horizontal plane, whereby two rectangular reinforced beams are produced in effect, and a reinforced concrete floor associated therewith for supporting the backing, cargo and other load, substantially as set forth."

"10. In a dock or pier of the class described, a shore section comprising a loaded subfloor positioned upon a suitable foundation adjacent to the water level, and an integral longitudinal wall and transverse bracing walls all formed of concrete, shear and tension members positioned within the concrete subfloor and bridging the foundation supports, series of reinforcing members coextensive with the longitudinal wall, and positioned within the

the prior art, are not infringed by its structure. The absolute invalidity of the claims is, at most, but faintly asserted. When Ferguson entered the field, reinforced concrete retaining walls were old, as illustrated for example, by the patent considered by us in City of Akron v. Bone, 221 Fed. 944, 137 C. C. A. 514. Manifestly, retaining walls do not furnish complete analogy to dock structures, for their problem is merely the resistance of strain from the shore side tending to overturn the wall or slide it into the water; while in the case of a dock its protection against strains from the waterside, as well as noninterference, so far as possible, with the flow of the stream, are important considerations. Ferguson was not the first to devise a reinforced concrete structure resting upon piles having their heads surrounded by the reinforced concrete, nor to use bracing walls for strengthening the front wall. Reinforced concrete floors, as such, were not new. See Trussed Concrete Steel Co. v. Goldberg (C. C. A. 6) 222 Fed. 506, 138 C. C. A. 106. But neither the prior patents cited nor the prior drawings of or publications concerning dock or other structures disclose devices anticipating the claims in suit; nor do these references, in our judgment, so far suggest the salient and distinguishing features of Ferguson's conception as to deny the presence of invention in these claims. For instance, the Hennebique publication seems to disclose only a retaining wall, without cargo floor or subfloor. The Schiekald "quay wall" publication is not shown to antedate Ferguson's actual invention, and it shows no means for bracing to shore and thus resisting shock from docking boats. The American Steel & Wire Company's docks (built after and not the subject of publication before Ferguson's invention) appear to have been of mass construction and to have wholly

upper and lower portions thereof, a suitable shore anchorage, and means connecting said integral concrete structure thereto, substantially as set forth.

"11. In a concrete pier or dock, the combination with a plurality of series of piling driven substantially to the water level, of an integral concrete structure erected thereon, comprising a subfloor loaded at its shoreward edge, reinforced foundations and longitudinal walls respectively erected above each series of piling, bracing walls positioned at intervals there between, tension and shear members within the subfloor, diagonal tension members within the bracing walls, tension members positioned adjacent to the outer edge of said dock, shore connections, and means for tying the shoreward section of the dock thereto, substantially as set forth.

"12. In a reinforced concrete dock, the combination with suitable subsurface supporting means, of a load-supporting concrete floor with tension and shear members therein bridging the supporting means, a longitudinal concrete wall integral with said floor, and reinforcing members within the upper and lower portions thereof, concrete bracing walls disposed at intervals between said wall and floor and integral with the structure thereof, whereby the concrete is availed of for compression strains, suitable shore anchorage, and connecting means uniting said dock therewith, substantially as set forth."

"16. In a reinforced concrete box, the combination with a series of piles positioned beneath the front of the dock, of a concrete wall erected thereon, reinforcing members imbedded therein and adapted to distribute the superimposed load, shoreward supporting means, a horizontal concrete floor integral with said wall and extending to said supporting means, reinforcing members imbedded within said floor adapted to distribute the load or impact, and means securing the structure to the shore, substantially as set forth."

lacked the subfloor of Ferguson. The Cedar Creek (Almirante) wharf also postdates Ferguson's actual invention and lacks the distinctive subfloor features. But even if every element in plaintiff's device were old, invention would still exist if by the combination of those old elements there is produced a new and useful result, or if the old result is affected in a new and materially better way—as in the case here.[3]  As said by the District Judge, Ferguson, so far as appears from the record, was the first in this country to construct or design a wholly integral reinforced concrete dock not of mass construction. The history of the construction of the Cleveland Furnace Company's dock shows that more than 50 per cent. in cost was saved by the more open construction involved in the device of the patent. The weighted floor below dock level, integral with the entire dock structure in front of it, is one of its distinguishing and valuable features. The utility of the dock is clearly shown by the acceptance of the plans therefor by the Cleveland Furnace Company in 1906 over all competitors; by several months testing of a section built prior to the building of the complete dock; by defendant's selection of the dock prior to January 1, 1910; by its use thenceforward, and yet again by defendant's extension of the dock in 1913—the alleged infringement (after at least three years use of the original section)—by adding another section exactly like the one constructed by plaintiff's company.

Defendant's structure differs from that shown by Fig. 1 of the patent drawings in these respects only: Instead of having one wall (I-beam in cross-section) it has two walls, connected by bracing of reinforced concrete therebetween; it has a subfloor in the rear of the front section on a level about midway vertically of the rear main wall and integral with that wall, and likewise carried upon piles. A portion of this subfloor contains a filling or backing over which a locomotive and cars run, another portion being used for the storage of cargo; the subfloor terminates at its rear in a concrete beam (similar to the two beams of the main dock) likewise resting upon piles. It is urged that this dock lacks the subfloor of the patent called for in all the claims in suit except claim 4.[4]

We see no merit in the proposition that this structure lacks the subfloor of the patent. True, it is not directly connected with the wall at the extreme front; but the patent clearly contemplated that there might be more than one wall of that construction in front of the subfloor. The

[3] Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 Sup. Ct. 652, 53 L. Ed. 1034; Ferro Concrete Constr. Co. v. Concrete Steel Co. (C. C. A. 6) 206 Fed. 666, 669, 124 C. C. A. 466; Proudfit Co. v. Kalamazoo Co. (C. C. A. 6) 230 Fed. 121, 127, 144 C. C. A. 418; Frey v. Marvel Co., 236 Fed. 916, —— C. C. A. ——, decided by this court October 3, 1916.

[4] The references in the various claims to the subfloor are these: In claim 6, "a reinforced concrete floor associated therewith for supporting the backing, cargo and other load, substantially as set forth;" in claim 10, "a shore section comprising a loaded subfloor positioned upon a suitable foundation adjacent to the water level;" in claim 11, "a subfloor loaded at its shoreward edge;" in claim 12, "a load-supporting concrete floor;" in claim 16, "a horizontal concrete floor integral with said wall."

patent expressly declares that the structure of Fig. 4 may be "employed for extending the same over indefinite areas, and at a distance into the water, or over marshy ground and the like"; also that "it may be extended indefinitely to afford a pier or dock of the desired area, carried upon a series of piling and superposed reinforced concrete foundation"; also that the structure of that figure is preferably provided with a rear or shoreward section such as shown in Fig. 1, "which affords the weighted subfloor and suitable anchorage." Defendant's structure performs the functions of the subfloor of the patent as declared therein, including the carrying thereon of "filling or backing which may be placed rearwardly of the front wall, and also the weight of apparatus, cargoes, etc., which is supported upon the subfloor." The patent expressly declares that the forms illustrated by the figures are merely preferred forms.

Nor are we impressed by the objection that defendant's structure lacks the transverse bracing walls called for by claims 10, 11 and 12.[5] While there is no substantial bracing wall directly connecting the rear longitudinal wall and the subfloor (a slight bracing being shown), we think the reinforced concrete braces between the two longitudinal walls, in connection with the subfloor integrally connected with the rear longitudinal wall, and thereby with the front wall and its superstructure, is the equivalent of the bracing walls called for by the claims referred to. The bracing between the two longitudinal walls completely performs the function of the bracing called for by the patent.

It is also urged that defendant's dock lacks the means securing the structure to the shore, called for by claims 4, 10, 11, 12, and 16.[6] The shoreward section of defendant's dock, instead of being anchored to stay piles and beams fastened to the rear of the shoreward section, and thus indirectly to the piling on which the structure rests, is anchored only through the medium of a rear longitudinal wall carried by the piles sustaining the shoreward end of the dock; there is thus no independent structure for anchorage only. The contention is that the patent office history of the application limits the method of anchorage to that shown in either Fig. 1 or Fig. 3. That history is this: The amended specification stated that within the "walls 7′ [the bracing walls] there are imbedded land ties in the form of tension members 9 which extend from the top of the wall 8′ [the front longitudinal wall] to any suita-

[5] The language of claim 10 in this regard is: "And an integral longitudinal wall and transverse bracing walls [between the longitudinal wall and the subfloor] all formed of concrete." Claim 11: "Bracing walls positioned at intervals therebetween" (that is, between the longitudinal walls—thus recognizing more than one longitudinal wall). Claim 12: "Concrete bracing walls disposed at intervals between said wall [the longitudinal wall] and floor [the subfloor] whereby," etc.

[6] These means are thus called for by the various claims: Claim 4, "means for anchoring said base and wall to the shore, substantially as set forth;" claim 10, "means connecting said integral concrete structure thereto [to the shore anchorage] substantially," etc.; claim 11, "means for tying the shoreward section of the dock thereto, substantially," etc.; claim 12, "connecting means uniting said dock therewith [with suitable shore anchorage] substantially," etc.; claim 16, "means securing the structure to the shore, substantially," etc.

ble shore anchorage." The examiner stated that the matter just referred to is new "so far as any tension members 'which extend from the top of the wall 8 to any suitable *shore anchorage*' is concerned," and that "if these claims which include 'a shore anchorage' are to stand, then the description must be made to unmistakably define just what is meant thereby." The applicant thereupon struck out from the specification the words "any suitable," and substituted "the," and his attorney, in accompanying letter to the department, said:

"Two forms of 'shore anchorage' well known in the art are respectively illustrated in Figs. 1 and 3, and this term has seemed preferable to the former 'connected with the shore,' which previously was found acceptable. Inasmuch as various forms of shore anchorage are well known in the art, it is believed that the objection will be withdrawn and the claims passed to issue."

The claims thereupon passed to issue without amendment. It is not suggested that the anchorage of defendant's dock is not one of the forms of shore anchorage well known in the art. We are unable to see anything in the history of the Patent Office application which estops the patentee from construing the claims in suit according to their natural and obvious meaning.

It is urged that defendant's dock has not the "shear and tension members" called for by claims 10, 11 and 12.[7] Figs. 1 and 4 of the patent drawings show horizontal tension members in the subfloor, also members "5" designated as "suspension or shear members," "contacting or coinciding with the [tension rods] throughout the central lower portion of the floor, but angularly bent to lie in a plane, adjacent to the upper portion of the floor, in positions above the supporting piling." The subfloor of defendant's dock is above the base of the rear main wall. It has no reinforcing members of angular shape, but has three courses of metal bars (not contacting with each other) extending longitudinally through the subfloor, in vertically parallel planes, and connecting with the rear walls of the shore section and front section respectively, both of which walls have vertical reinforcements. The patent declares that many of the reinforcing members specifically mentioned "may be dispensed with, or modified to meet varying conditions of service." The claims in suit do not call for tension members as distinct from shear members, nor for any particular method of reinforcement for resisting tension and shear strains; the requirement is only that the reinforcement have such function; the form of such reinforcement is not a distinctive feature of the patent. We are disposed to think that defendant's reinforcing members do furnish substantial resistance to shearing strains, and so should be considered as responding to the call for "shear and tension members" within the subfloor, especially in view of the testimony as to the then state of the art.

These considerations lead us to the conclusion that the defendant's structure infringes each of the six claims in issue.

---

[7] The language of the claims in this regard is this: Claim 10, "shear and tension members positioned within the concrete subfloor," etc.; claim 11, "tension and shear members within the subfloor;" claim 12, "a load-supporting concrete floor with tension and shear members therein bridging the supporting means."

[3] 4. As already said, defendant's original dock was built by plaintiff's company in 1910, after the filing of original application for patent, but before allowance. The dock was plainly marked to show that patent had been applied for. The infringing section of dock was built after the renewal application, but before patent issued. Section 4897, already quoted, provides that:

"No person shall be held responsible in damages for the manufacture or use of any article or thing for which a patent was ordered to issue under such renewed application prior to the issue of the patent."

Defendant construes this to mean that one who begins the use of the subject of the patent prior to its issue is forever relieved of all liability therefor or interference therewith, notwithstanding its use subsequent to the patent. Having in mind the intent of the statute to favor rather than to prejudice the applicant, we cannot agree with this construction. We think the language should be strictly construed, and not extended beyond its necessary meaning, which we think forbids recovery for damages accruing previous to the issue of patent, but does not forbid remedy by injunction and damages if use is continued subsequent to issue. It seems reasonable that the clause was inserted to repel a construction, perhaps otherwise possible, that liability should date from the time the patent was first allowed. It is noticeable that the statute does not relieve from liability to injunction (which, of course, could not issue until after patent issues). The decree of the District Court expressly found infringement "since the grant of said letters patent," and decreed injunction and accounting, which, it is assumed, was intended to relate to such damages only.

The decree of the District Court is affirmed, with costs.