## WESTERN ELECTRIC CO., Inc., v. WALLERSTEIN.

### No. 7.

District Court, W. D. New York.

July 18, 1931.

See, also, 48 F.(2d) 268.

Charles Neave, of New York City, and Charles W. Parker, of Buffalo, N. Y. (Charles Neave, Henry R. Ashton, F. T. Woodward, J. G. Roberts, and E. J. Driscoll, all of New York City, of counsel), for plaintiffs.

Barton A. Bean, Jr., of Washington, D. C. (William H. Davis, Willis H. Taylor, Jr., Theodore S. Kenyon, Edgar F. Baumgartner, and G. Willard Rich, all of New York City, of counsel), for defendant.

GALSTON, District Judge.

This is a patent infringement suit in which infringement of patents to Lowenstein, Mathes, Colpitts, Arnold, and Blattner is urged.

The defendant operates the Broadway Theatre located in Buffalo. The infringing apparatus is a sound-on-disc talking motion picture reproducing mechanism, which was installed in the defendant's theatre some time prior to May 7, 1929. The infringement complained of is the use of two type 10 and two type 11 audio amplifiers manufactured by Pacent Electric Company, Inc.

The five patents were issued to the American Telephone & Telegraph Company, one of the plaintiffs. Another of the plaintiffs is the Western Electric Company, which is the manufacturing subsidiary of the Telephone Company. It is controlled by the Telephone Company through its ownership of more than 98 per cent. of the capital stock of the Electric Company. The third plaintiff, Electrical Research Products, Inc., is a subsidiary of the Western Electric Company, which owns all of its stock and which is engaged in the commercial distribution of sound picture apparatus and some other commercial products manufactured by the Western Electric Company.

Western Electric and Products are the exclusive licensees of the Telephone Company under the patents in suit.

The defense herein was undertaken by Warner Brothers Pictures, Inc., for the reason that Warner Brothers control the chain of Stanley theatres which have installed Pacent talking picture reproducing systems similar to that of the defendant herein.

The patents involved are of extreme importance, some of them, perhaps, going to the very heart of the sound moving picture industry, although at the time of the conception of these inventions their association with the reproduction of pictures was not even remotely imagined.

Rather, the early researches of the Telephone Company were directed to the improvement of transcontinental telephonic communication. Such a line was completed in July, 1914, and was open to the public in January, 1915. Repeaters were required for satisfactory long-distance telephone service. Such development was undertaken by the Telephone Company as early as 1903, but it was not until the De Forest three-electrode vacuum tube, and the associated circuit in which it was to be used, had been developed, that marked progress was made.

Extraordinary progress in the art of sound reproduction followed De Forest's disclosure of the three-electrode vacuum tube. The problems involved were intricate. Sound is composed of a wide range of frequencies. A range of frequencies audible to the human

ear extends from about 16 to 16,000 vibrations per second. The piano range is estimated to be from 30 to 5,130 cycles per second.

It is not necessary, as appears from the record herein, to reproduce so wide a range for effective telephone communication; but it is necessary to embody such wide range for successful reproduction of sound pictures and kindred purposes. In other words, much greater power is required to drive the loud speakers employed for public broadcasting and sound picture reproduction than is necessary for radio or telephonic reception, for the reason that the output of these loud speakers must fill large auditoriums and large outdoor areas. Distortion in the reproduction of the sound must, therefore, be zealously guarded against.

It is in these large power applications of audio amplifiers that the inventions, which are the subject-matter of the patents, are concerned, though, of course, they may be used in other fields.

All of the inventions relate to circuits in which the three-electrode tube is employed. These inventions are capable of conjoint use, and are, therefore, properly embodied in this one cause of action.

The scientific principles and the highly technical and abstruse problems involved, at all times presented to the court an intellectual challenge. It is with a feeling of marked appreciation that the court acknowledges the assistance and co-operation given throughout the long trial by counsel and experts alike.

Patent No. 1,231,764, issued to Fritz Lowenstein July 3, 1917, on an application filed April 24, 1912, and renewed April 26, 1917, is for an improvement in telephone relays. With the exception of the third claim, all of the claims are alleged to be infringed. They are resisted on the ground of invalidity, and also because of an alleged estoppel arising out of a license from the Electrical Research Products, Inc., to the Vitaphone Corporation.

The plaintiffs urge claims 1 and 7 as typical, and, therefore, attention may be focused upon them. They read as follows:

"1. Telephone apparatus comprising the combination, with a talking circuit, of a suitably energized relay circuit including an anode and a cathode separated by a conductive gap, a modulating device interposed in said gap and electrically connected with said talking circuit, means for impressing upon said modulating device a potential more negative than that of said cathode, and a translating device arranged to be energized from said relay circuit."

"7. The combination, with an audion having its anode and cathode included in a suitably energized circuit, of means for impressing upon the audion grid a potential more negative than that of the audion cathode."

This patent was adjudicated in the Southern district of New York, and these claims, the only claims therein involved, were held valid. Radio Corporation of America et al. v. J. H. Bunnell & Co., Inc., (D. C.) 25 F. (2d) 847.

It is contended by the defendant that the result reached by Judge Winslow, who decided that case, was due to errors of fact.

The object of the invention was a relay whereby potential differences of incoming speech currents were sought to be maintained in the telephone receiver, with the reproduced sound composed of waves of the same frequencies as those of the incoming sounds, and having the same relative amplitudes as in the original sound waves.

In the long distance telephone art as then known to Lowenstein, he found that under certain conditions the speaker's voice was plainly heard in the receiver, while at other times it was unintelligible. This defect he ascribed to the fact that speech currents of higher frequencies become attenuated to a greater relative extent than those of low frequency. Such results were due to electrical properties of a long line. He further observed that the distortion was but little affected by terminal conditions, and concluded that relays or receiving apparatus functioning according to current values could not remedy the distortion nor compensate for the effects; but he said terminal voltages are affected by terminal conditions, and hence argued that it was possible to select such terminal conditions as would enable the relative amplitudes of the original voltages to be well maintained at the incoming end of the line. He reasoned that a relay apparatus which functions according to terminal voltages was well adapted for the production of receiver operating currents of the desired absolute strengths, and in the relative strengths required for successful operation of the receiver.

Referring to the drawing, we need consider only the circuits concerned with the three-electrode tube 14. The controversy as to the scope and the meaning of this patent

arises out of the construction to be given to the following paragraph of the specification: "The potentials created in secondary 13 are made to control the current flowing through the ionic field and originating in battery 21 by connecting the one terminal of coil 13 to the modulating member 18 and the other terminal of said coil to a point on the battery 21, which is located ultranegatively relative to the negative point of the battery connected to the filament."

The plaintiffs' position is that these words must be interpreted as meaning that the grid was connected to a point on the battery 21, more negative than any part of the filament. The defendant's position is that a grid biasing potential, more negative than the most negative potential point of the filament, is not disclosed.

The battery connected to the filament, as interpreted by the plaintiffs, refers to the battery 19. The defendant, on the other hand, insists that there is nothing in the specification to indicate that the negative end of the filament battery 19 is that which is connected with the filament through the lead from the battery 21.

The passage is not unambiguous. In the sentence preceding the quoted passage, it is the battery 21 which is referred to when reference is made to the connection of the filament with "a negative point of the battery."

The defendant contends that whether the grid biasing potential should be more or less than the most negative potential point of the filament depends upon characteristics of the vacuum tube not disclosed in the Lowenstein patent, and, moreover, that such a negative grid potential was not suitable for the three-electrode tubes known at that time.

The defendant urges that the poling connection of the filament with battery 19 is important, because on it depends whether the grid will be more negative than the negative side of the filament. It is argued that if the positive end of battery 19 is connected to the lead then the grid can never be more negative than the negative end of the filament, unless that portion of the battery 21 connected between the grid and filament has a greater potential than the battery 19.

As has been intimated, the defendant interprets "to the negative point of the battery connected to the filament," as referring to the battery 21, and argues that such interpretation harmonizes with the phrasing of claim 3, whereas plaintiffs' interpretation is contradictory of claim 3. Claim 3 reads: "Tel-

ephone receiving apparatus comprising the combination, with a talking circuit, of an ionic controller having an anode and a cathode suitably spaced apart, a battery, connections from said anode and cathode to the battery, a grid electrically connected to said talking circuit and interposed between said anode and cathode, a connection from said grid to said battery, the battery connection of the grid being negative with respect to the battery connection of the cathode, and a telephone receiver arranged to be energized from the controller circuit."

The phrase "a connection from said grid to said battery," the battery connection of the grid being negative with respect to the battery connection of the cathode, certainly would indicate that but one battery was referred to as descriptive of the connections, to wit, the battery 21, as was admitted by Mr. Waterman in his cross-examination.

Plaintiffs seeking to avoid this interpretation draw attention to the showing in Lowenstein's drawing of more cells in the C battery section of the battery 21 than in battery 19, and conclude that the grid is ultranegative with respect to the whole cathode, no matter how the battery 19 is poled.

It seems to me that this conclusion is unwarranted, for, as was admitted at the trial, Patent Office drawings are not working drawings. Therefore, one cannot safely venture an opinion that, because the battery representation in a Patent Office drawing indicates a given number of cells, the inventor intended in practice such number of cells to be employed.

In the conflict of interpretation, it is helpful to refer to the original application and prosecution thereof in the Patent Office. The original specification set forth: "The potentials created in secondary 13 are made to control the current flowing through the ionic field and originating in battery 21 by connecting the one terminal of coil 13 to the modulating member 18, and the other terminal of said coil to a point on the battery 21, preferably located ultra-negatively relative to the negative point of the battery connected to the filament. Both the positive and the ultra-negative points of connection to battery 21 are adjustable to enable variation of the driving potential of 21 for the ionic field and of the ultra-negative potential."

The three claims forming part of this specification were rejected on letters patent to De Forest, No. 841,387, January 15, 1907, and No. 995,126, June 13, 1911. In the ar-

gument in support of the amendment, filed in response to those citations, it was admitted that a device like De Forest's which, while it was contended operated proportionally to current variations and not proportionally to potential variations, "could still be said to be actuated by potential variations of the main current, because in a circuit a potential causes a current flow;" and it was argued that the amendment to claims 1 and 3 brought out the fact that the applicant's device "is one in which the variations of potential in the main circuit are relayed into the relay circuit in substantially proportional form, so that a true 'potential actuation' of the translating device as distinguished from a 'current actuation' of said translating device is obtained." This, applicant thought was new, and differentiated his device from De Forest.

It may be noted that in the claims as originally presented, the term "ultra-negative" was not employed. It appears in the claims for the first time, in claim 4, as filed with that amendment of May 28, 1913, wherein it is said that there are means provided for maintaining an ultra-negative potential on the modulating device, i. e., the grid 18.

The attorney for the applicant wrote: "New claim 4 brings out the additional feature of the ultra-negative potential connection of the battery 21 to the grid 18. As this is new with applicant, it is thought this claim should be allowed since it is due to the ultra-negative potential of applicant's grid or separator 18 that the sensitiveness and quick response of applicant's relay is obtained."

On August 8, 1913, all claims were rejected, claims 1 and 2 by reference to Weintraub, No. 921,930, and Von Lieben, No. 1,038,910. The Examiner noted that both of those citations showed devices operating according to variations of potential rather than variations of current. And as to claim 4, referring to Fig. 2 of Von Lieben, the Examiner said: "It is clear that the fall of potential across the resistance Rw will allow of any gradation of potential difference found to be desired."

On August 6, 1914, Lowenstein's attorney filed an argument analyzing the patent cited. He maintained that the Weintraub device is a current intensifier, and not a potential current translator.

As to Von Lieben, the attorney pointed out that his grid H is positive, as against the negative portion of the filament, to the grid H, and hence concluded that Von Lieben was not a disclosure of "a potential-operated device."

And in this argument appears now for the first time insistence by the applicant that claim 4 as filed expressly sets forth that the grid, being ultranegative, is *"more negative than any part of the filament;"* and attention is called to lines 51 to 54, page 1, of the Von Lieben patent, "from which it appears that the potential of the grid electrode is chosen between that of the cathode and the anode."

In the next action of the Patent Office, while the claims are rejected for various reasons, it is admitted by the Examiner that Von Lieben in Fig. 2 does not make it clear that his grid is connected to the battery in such a way as to render it negative with respect to the filament. The Examiner adds: "As shown it would appear to be connected so as to be negative with respect to one side of the filament and positive with respect to the others, and is probably intended to be a neutral connection. The advantage of making the grid slightly negative rather than neutral has not been clearly pointed out by applicant and it would seem that this point should be made clear before claim 4 is allowed."

This led to an amendment on September 11, 1915, in which the advantage of making the grid ultranegative was stressed, and was accompanied by the affidavit of the applicant of September 8, 1915.

The amendment to the specification was this: "This ultra-negative connection is especially desirable and constitutes an improved feature of my invention in its preferred embodiment. The volume and clearness of speech as heard in the receiver in the arrangement shown is materially greater than where the grid 18 and coil 13 are connected, for example, to a point at the same potential as the filament 16. The theoretical considerations involved are somewhat abstruse and not fully understood; but the advantage of the ultra-negative connection is fully established by repeated tests which I have carried out in actual practice. I therefore note the fact without attempting to explain it."

In the affidavit in support of the amendment, Lowenstein, tracing the history of his invention, states that claims 1, 2, and 3 of his invention were conceived in the year 1906. It seems that he was engaged in carrying on some experiments involving the use of a Cowper-Hewitt mercury rectifier, in the course of which he discovered that, by touching a certain portion of the connected anode arm of the evacuated rectifier, the current

was interrupted. This was evidenced by the fact that the anode arm ceased to glow.

Further tests led to the discovery that the effect produced depended upon where the experimenter stood in the static field conditioned by the circuit wires of the apparatus. He found that, when he stood in one position and touched the anode arm, the rectifier would be totally interrupted; sometimes also when the rectifier tube was under potential, but with no current flowing, if he touched the anode arm the current was thereby started. He concluded that this phenomenon could be made use of in connection with telephone repeaters or relays.

More experiments were made in the winter of 1909–1910, wherein the grid was connected merely to one side of the filament, that is, at the same potential as the filament. It was in these later experiments that he substituted, for purposes of comparison, the ion control for the ordinary receiver of the usual telephone system.

In 1911, Lowenstein constructed vacuum tubes of different shapes and dimensions to determine those most advantageous for his purpose. These tests showed that the ion control receiver was far superior to the results obtainable with the ordinary telephone receiver.

It may be noted that thus far in his affidavit Lowenstein made no reference to the ultranegative condition of the grid; but in a talk in 1911 between New York and Chicago, when he employed a condenser in the grid circuit, finding that the talk over the line was poor, the current through the controller tending to choke or stop, he discovered that the trouble could be remedied by touching the grid binding post repeatedly to discharge the grid and to open up the talk. He says: "This gave me the idea of connecting the grid to a point ultra-negative in potential relative to the filament."

Nevertheless, the succeeding action of the Commissioner of Patents was to reject claims 1, 2, and 3, on the ground that they defined nothing more than the ordinary audion disclosed by De Forest, 995,126, or Stone, 884,110.

As to the new claims, the Examiner made this interesting comment: "Claims 4, 5 and 6 bring out the idea of making the grid ultranegative with respect to the filament. In the first place, experience has shown that in use the audion such as shown in the De Forest patent acquires a negative charge, due principally to the discharge of negative ions from the cathode. Hence there is a means in De Forest's audion for making the grid ultranegative with respect to the cathode."

Then, as evidencing how the art develops through error, the Examiner says: "In Stone this situation was treated as a defect and was overcome by including a source in the grid circuit which rendered the grid positive with respect to the cathode," and concludes with the observation: "It does not appear that it is of any material difference whether the grid be made positive or negative with respect to the cathode and it is not believed to involve invention to change the polarity of the source of the current z in the patent to Stone so as to render the charge upon the grid negative instead of positive."

The Examiner then rejected claims 4, 5, and 6 on reference to the Von Lieben patent.

Following a personal interview with the Examiner in charge, the claims were canceled, and reference to the Examiner's contention is thus made: "The Examiner's position seems to be that in the arrangements illustrated in certain of the citations, a charge more negative than that of the audion cathode may now and then be impressed upon the intermediate grid by reason of its circuit connections."

From the foregoing history of this application, I am persuaded that Lowenstein did not disclose a negative poling of battery 10 to the filament, and moreover, that what he sought and stressed was merely to make the grid more negative than the filament. That he accomplished by connecting each to the battery 21, as illustrated in the patent drawing. I believe also that defendant's reading of claim 3 is sound.

For the conclusion that what Lowenstein set forth is not invention, the defendant urges a number of reasons.

It is insisted that amplification by a vacuum tube with minimum distortion requires a grid bias, but that the value of that bias depends upon the degree of evacuation of the tube, the value of the voltage applied to the plate, and the geometry of the electrodes. The defendant contends that it is only because the modern tubes are so highly evacuated and are designed to be employed with so high a plate voltage, and because of the structural arrangement of the electrodes, that the grid bias to be applied should always be more negative than that of the most negative point of the filament; and the defendant argues that those conditions were not characteristic of the vacuum tubes avail-

able to Lowenstein and in use either at the time of his invention or at the date of the filing of his application.

Though it may be admitted that a passage in the Lowenstein affidavit shows that he considered the geometry of the tube, there are expressions employed by Lowenstein in the specification which show that he was not concerned with a highly evacuated tube. This is particularly indicated in his description of the ionic controller. He says the incandescent filament produces ionization of the gas and makes the gas a conductor, and "the potential between filament 16 and anode 17 derived from the battery 21 creates a static field between such filament and anode which exerts a driving power on the *ionized gas particles* which come in contact with incandescent filament 16 and which are thereby electrically charged * * * and the amount of negative current which is, therefore, conveyed through the field is dependent on the ionization power of the filament." (Italics mine.)

Again: "The individual charge is a function of the *negative potential* of the filament and also of the *degree of evacuation* * * * Therefore the current in the ionic field circuit will increase with the incandescence of the filament, the potential difference of the battery and, up to a certain point, *with the evacuation*." (Italics mine.)

All of these expressions would justify the inference that Lowenstein was dealing with a vacuum tube of low evacuation containing ionizable gas.

Defendant then argues that a grid biasing potential more negative than the "most negative point of the filament" was not suitable for the De Forest tubes of Lowenstein's day, as further evidence of the fact that Lowenstein did not teach that the grid biasing potential should be more negative than the "most negative point of the filament."

Moreover, the defendant contends that the results of the tests described in the Lowenstein affidavit, filed during the prosecution of his application, in view of the tubes then in use, can be explained only on the assumption that the plus terminal of the filament heating battery was connected to the filament lead that runs down to the battery 21, so that its potential was opposed to the biasing potential, and that in effect the grid bias was more positive than the negative *end* of the filament.

It may be noted that both of the experts, Mr. Waterman and Professor Bowles, agree that about twenty-five or thirty volts were the average plate voltage for amplifier tubes of the De Forest gassy type; that is, those used at the time of Lowenstein's invention.

In consequence, a study of Plaintiffs' Exhibit No. 29 affords considerable interest. It is a chart of characteristic curves, plotted with respect to the grid biasing potential of a three-electrode vacuum tube. It seems to be agreed by the experts in the case, that to get a signal substantially free from distortion the tube must be operated with a grid bias that corresponds to the middle point on the straight line portion of the characteristic curve. Interpreting the lower chart of this exhibit, it appears that, with the 200 volt curve, a zero grid potential is required to transmit without distortion the positive and negative voice of the incoming signal. Likewise it appears that, with the 250, 300, 350, and 400 volt curves, the grid bias in order to avoid distortion would have to be progressively negative; but that with the 150, 100, 50, and 25 volt curves the grid bias would be progressively positive.

The inferences deduced from a reading of these graphs were corroborated by tests made in the courtroom during the trial under the direction of defendant's experts, Professor Bowles and Dr. Ferrand. These courtroom demonstrations included tests on tubes of the old De Forest type, as well as modern tubes, and the showing seemed to be that whether the grid bias potential was to be positive or negative, with respect to clarity and intensity of the reproduced signal, depended upon the plate voltage and the type and geometry of the tube.

Lowenstein may, nevertheless, have made an invention; but it is in the light of this understanding of the action of a vacuum tube and in the light of the prior art that we must consider the nature of his contribution.

Patent No. 1,038,910 to Von Lieben and Reisz shows a grid bias intermediate between the positive and negative terminals of the filament, and indicates means for making this bias more negative than the *average* potential of the filament. This, too, depended for operation upon gas ionization, and one must deduce that Von Lieben and Reisz disclosed a causal relationship of a biasing potential on the grid to the filament. That being the case, was invention involved in determining whether in a given tube the biasing potential lay positive, on the zero axis, or negative?

In this connection, the comment of the Examiner referred to hereinbefore that "it is not believed to involve invention to change

the polarity of the source of the current in the patent to Stone so as to render the charge upon the grid negative instead of positive," challenges attention despite the fact that the Examiner clearly was wrong in contending that "it does not appear that it is of any material difference whether the grid be positive or negative with respect to the cathode."

But it seems to me it does follow that if the art showed there was a causal relation between the potential of the grid and the potential of the filament, there could hardly be invention in selecting a proper bias, unless at the same time it was pointed out how that bias was to be determined by the characteristics of the tube.

Mr. Justice Stone, in De Forest Radio Co. v. General Electric Co., 51 S. Ct. 563, 569, 75 L. Ed. 1339, in his opinion concerning the validity of the Langmuir high vacuum tube patent, said: "There was little or no practical use for a high vacuum tube in 1913. The De Forest audion was not in general use and Langmuir did not see one until that year."

This offers additional reason for believing that the defendant is correct in urging that, at the time of the filing of the Lowenstein affidavit in support of his invention, Lowenstein at most was referring to the low vacuum tube which the commercial art then knew.

It is for the foregoing reasons that I believe the Lowenstein contribution, however valuable it may subsequently have proved to the art, was not invention.

The next patent to be considered is that to Robert C. Mathes, No. 1,426,754, issued August 22, 1922, on an application filed October 23, 1916. This patent relates also to improvements in circuits for electron discharge devices.

Only claim 25 is in issue. It reads as follows: "In a vacuum tube amplifier circuit wherein the space current of said amplifier depends upon the voltage of a variable source of current connected to an anode and a cathode, the method which comprises supplying said circuit with at least two impulses, one a compensated impulse derived from an effect produced by variations of said source and the other due to an impulse to be amplified."

Claim 8 of the patent was held to be valid and infringed in Radio Corporation et al. v. J. H. Bunnell & Co. (D. C.) 22 F.(2d) 847. The subject-matter of claim 8 is disclosed in Fig. 1. The voltage drop across the resist-

ance 9 in the grid-filament circuit maintains on the grid a potential more negative than any part of the filament, but because the defendant's grid biasing resistances are shown each connected in a path coming to the grid and the plate circuits instead of between the grid and the filament, infringement of this claim is not alleged. It is the compensating aspect of the Mathes invention, therefore, that is involved in this case. The inventor states:

"A further object is to furnish a method and means for compensating for fluctuations in the potential of the output circuit battery of the vacuum tube."

"Specifically these objects may be realized by the indirect use of the heating battery or of some other source, but in either case associating said source with the output circuit battery."

Mathes said that it was well known that current flowing through the output circuit undergoes fluctuations owing to changes within the power battery. It was the difficulties caused by these fluctuations in the space current of the vacuum tube that Mathes sought to overcome. The method he proposes, he explains as follows: "Assume that the vacuum tube circuits are so arranged, as hereinafter described, that the current for the input circuit comes from a source in series with the source for the output circuit. For illustration, suppose there is a decrease in the potential from the output circuit battery due to some internal change; this will necessarily tend to decrease the space current [1] between the filament and anode of the vacuum tube. If the input and output batteries are of similar nature, this change will in all probability also decrease the potential of the input circuit battery, which is in series with it, so that

[1] The term "space current" is not explained in the patent nor do I recall that it was defined at the trial. It is used also in the Arnold patent. The term is discussed in De Forest Radio Co. v. General Electric Co., infra, in the opinion of Mr. Justice Stone, supra. He says:

"The number of electrons emitted by the filament is determined by its temperature. But the current passing through the plate loud speaker circuit depends on the number of electrons drawn from the filament to the plate, and this in turn depends on the voltage of the current passing to the filament.

"When it is high enough to force all the electrons emitted by the filament to pass from filament to plate, increase in the voltage at the filament will not produce an increase in current in the loud speaker circuit and the tube is then said to be 'saturated.' As successful operation of the tube depends on the response of the loud speaker current to changes in voltage effected by the voice or input current, the tube is most efficiently operated at a voltage of a range below saturation, and a current within this range is known as the 'space current.'"

the grid potential will become less negative thereby tending to increase the space current to its former value. The compensation would take place in a similar manner for an increase in the voltage of the batteries, due, for instance, to the batteries being charged by some suitable means."

The circuit defined in claim 25 is illustrated in Fig. 3 of the patent. The negative grid voltage is supplied from the drop of potential across the terminals of the resistance 9. This drop is due to a source of voltage 7, associated with the battery 5 of the output circuit. To prevent the grid from reacting to sudden fluctuations in the battery 7, a condenser 18 and an inductance 16 are provided, the latter inserted in series with the battery. Fluctuations in battery 5 are made by a condenser 20 and inductance 21. Provision is also made for a condenser 17 to be shunted across the resistance 9 to provide a path for the oscillations in the input circuit. A vacuum tube 15 is employed as a resistance, having a heated filament 27 and an anode 28.

Batteries 7 and 5 of Fig. 3 are of the same type and are subjected to the same sorts of fluctuations. The inventor says: "If, for example, these batteries are dry cells, they will gradually drop in voltage as they are used and, as explained heretofore, a gradual drop in the voltage of the output battery will be compensated for by a similar drop in the input battery. If these batteries are storage batteries, there will be a gradual drop in voltage of both input and output batteries during discharge."

From the foregoing description, it should appear that the two impulses referred to in the claim are impulses in the plate circuit. The *compensated* impulse referred to in the claim is the plate voltage. The uncompensated impulse, that is, the impulse to be amplified, is the signal. Hence Mathes' method is to supply to the plate circuit compensated source variation impulses and uncompensated signal impulses.

The defendant contends that claim 25 is invalid because of anticipation, and urges noninfringement on the ground that his arrangement was derived, not from Mathes, but from the prior art.

In connection with the defense of invalidity, the defendant endeavors to read claim 25 so broadly as to bring it within the disclosures of the prior art, particularly those of Von Lieben. The interpretation thus offered is sought to be supported by a reference to another Mathes patent, No. 1,493,216, on application filed in February, 1919. It was in this later application that claim 25 of the patent in suit originated. In transferring the claim to the application which resulted in the patent in suit, Mathes stated: "New claims * * * are the same * * * as allowed claims 12, 13 and 19, application serial No. 277,566 filed February 17, 1919. It is believed that the Examiner will have no hesitancy in allowing these claims in this application, since at times when generator 19 is connected to the circuit, the energizing current for the tubes is derived from this source."

Whether, as originally filed in the later application, this claim had a wider connotation seems doubtful; but at any rate the claim reads certainly on Fig. 3 of the patent in suit, and the specification affords a sufficient disclosure of it.

I think the claim essentially defines a method. It is not limited to any specific arrangement or apparatus by which the method may be practiced. Therefore, I reach the interpretation of the claim, as hereinbefore set forth, which in effect is the plaintiffs' version thereof.

Now, in respect to the prior art, the defendant relies on the Lowenstein patent in suit, on an article in the Electrotechnische Zeitschrift by Eugen Reisz of November 27, 1913, the Von Lieben and Reisz patent, 1,038,910 of 1912, Langmuir, 1,273,627, and Colpitts and Arnold, 1,388,450.

First as to Lowenstein. In urging this patent as an anticipation, the defendant points out that in Lowenstein the current for the input circuit comes from one part of the battery 21, and the current for the output circuit comes from the same battery, and concludes that thus the source of the input circuit current is in series with the source of the output circuit current.

But it does not appear to me that the two sections of the Lowenstein battery are operative in series. One end supplies the grid, and the other the plate. Mr. Waterman explained that the grid does not draw current, but the plate does. He concluded that the two parts of this battery 21 would not run down together and would not be subject to corresponding voltage fluctuations. It is possible, of course, that the sections might run down together, and then there would be some compensation. Both compensating actions of Mathes are not found in Lowenstein, even if one admits such accidental compen-

sating result. For example, the more exact compensation attained by Mathes by means of the two element vacuum tube 15 is in no way indicated in the Lowenstein circuit. The impedance of this tube decreases as the current passing through it increases. A current change through the circuit beginning with the right-hand section of battery 7 through resistance 9, impedance 15, and the inductance 16 to the opposite end of the battery will be greater than the voltage change which produced it. At the same time that this occurs, the ratio of the resistance 9 to the resistance of the tube 15 changes, thereby altering the proportion of the voltage of battery 7, which is made available for biasing, and thus increasing the compensating effect.

The Electrotechnische Zeitschrift article by Eugen Reisz may be discussed also in connection with the Von Lieben and Reisz patent. It appears that Von Lieben and Reisz disclosed the normal grid bias as more positive or less negative than the filament, but Professor Bowles argues that there is associated with the output of the B battery a filament-heating and grid-biasing battery, which biases the grid by a drop in potential across a resistance. He infers that this battery and resistance correspond to the filament-heating and grid-biasing battery 6 and the resistance 9 of Mathes. He admits that the Von Lieben tube, shown in Fig. 4 of this article, discloses a desirable grid bias more positive than the negative side of the filament, while in Mathes the grid bias was more negative than the negative side of the filament; but the defendant claims that claim 25 embraces both of these arrangements.

As has been said heretofore, I think this interpretation of claim 25 is not justified, and, in consequence, that the reference to the work of Von Lieben and Reisz does not show an anticipation of this claim. In other words, to make these references effective would compel such a broad reading of the claim as seems to me to be wholly unwarranted.

The references to Langmuir, 1,273,627, and to Colpitts and Arnold, 1,388,450, are mainly for the purpose of showing in the prior art a biasing resistance in series with a source of plate current and supplying a compensating negative potential to the grid.

The Langmuir patent is for a method of and means for controlling potentials. This patent is one of considerable interest. Langmuir, in his specification, says: "The greater the current the greater the drop in potential in the resistance 13 and the greater the difference in potential between the grid and cathode. Thus as the current increases, the grid becomes more negative until a current value is reached at which further increase is prevented by the negative potential on the grid."

Professor Bowles was of opinion that in the Langmuir arrangement a variation of potential of the plate battery would be accompanied by the Mathes compensation effect on the grid; but the defendant seems compelled to make the admission that the Langmuir patent in itself is not a disclosure of claim 25 of the patent, and for that reason urges that it would require no invention to use the Langmuir arrangement for securing a compensating negative grid bias, because a like arrangement for the specific purpose is shown in the Colpitts and Arnold patent. This latter patent, though, makes no provision for permitting the signals to pass uncompensated.

The defendant complains that claim 25 does not contain the limitation that the signal impulse is not to be subjected to the compensating effect. I think, however, the claim both in language and in effect means that the signal impulse is not to be subjected to the compensating effect. The claim refers to two impulses. One it specifically designates as a compensating impulse, and "the other due to an impulse to be amplified." The latter, of course, must refer to the signal, and the specification as to that, says: "Condenser 17 may be shunted across 9 to serve as an easy path for the oscillations in the input circuit."

And Mr. Waterman said:

"The arrangement of fig. 3 provides for avoiding this difficulty in two ways: first, the alternating current in the plate circuit is, so far as practicable, kept out of the battery altogether. It is caused to pass through the condenser 12 and the primary of the transformer 13, and any current flowing in the grid circuit—the input circuit—coming from the transformer 8 is prevented from passing through the resistance 9 by the shunting of the resistance 9 with the condenser 17."

"The signal current is a rapidly, varying current, varying from say 50 to 5,000 times per second. Such a current will pass readily through a condenser, while the battery current will not pass through a condenser at all; therefore, by putting a condenser such as 17 around resistance 9, a passage is provided for the alternating current, while the direct

current flow from the battery is compelled to pass through the resistance 9 and the resistance 15; therefore, the compensating effect is experienced as regards the direct-current supply sources of the system, while no such effect occurs to prevent each tube giving its full amplifying power for the signal."

"It is this combined aspect of the Mathes invention that I understand is suggested to the engineer by the language of claim 25; and there are two classes of impulses that we have to deal with here: one is the power source for the plate circuit and the source of voltage for the grid circuit. These it is desired to compensate for fluctuation. It is not desired to compensate out the signal current, yet the signal is likewise supplied to the circuit. The idea is, therefore, to differentiate between those two, compensating one and not the other."

I conclude, therefore, that Mathes made a valuable contribution to the art, that it was the result of invention, and that claim 25 is valid.

The defendant seeks to avoid infringement on the alleged ground that his biasing resistance is in series with, and derives its current from, the source of the plate current itself; that such arrangement is not shown or suggested by Mathes, but on the contrary is disclosed, as the defendant claims, by Colpitts and Arnold.

It will be necessary to refer to the wiring diagram of the defendant's circuits. The grid biasing and plate voltages for the tube V2 pass upwardly from the filter to the coil P3, thence to the plate, across the space to the filament, down from the filament to the coil S9, then up through the resistance R2, thence to the left, and down to the other end of the power supply. The flow of current through the resistance R2 causes a drop in voltage and impresses on the grid a potential more negative than any part of the filament, the opposite end of R2 being connected to the filament.

Mr. Waterman contends that the resistance R2 of the defendant's circuit corresponds to the resistance 9 of the Mathes patent. This resistance is in series with the tube V2 itself, and to that extent V2 corresponds with tube 15 of Mathes, which also is in series with resistance 9.

In the defendant's system, as the power supply voltage varies, the direct current voltage in the plate circuit of the tube V2 will vary. Such variations must cause variations of the normal current flowing through the

tube, and will also cause the resistance of the tube to vary. Increase of current through V2 increases the current through R2, since they are in series, and that in turn increases the voltage drop across R2, and increases the negative bias on the grid. This tube V2, therefore, in the defendant's circuit and device performs the function of amplifier and regulator of the flow of current.

Thus in defendant's circuit there are two compensating activities; and, as in Mathes, provision is made to let the signals pass without themselves being compensated. This function is performed by defendant's condenser C, and is the equivalent in function of the condenser 17 of Mathes.

It seems to me that the defendant could avoid infringement only by successfully pressing his interpretation of claim 25. Inasmuch as I cannot accept that view, I find claim 25 infringed.

The next patent to consider is that to Colpitts, No. 1,128,292. This patent is perhaps the most interesting of those involved in the litigation. The invention relates to electric wave amplifiers, and particularly to the use of vacuum discharge repeaters for repeating and amplifying, in an output circuit, waves of electric energy received in the input circuit. Here, again, the inventor's object was to free these waves from distortion.

Colpitts found that a single audion repeater does not repeat in the output circuit a perfect form of reproduction of the electric wave received in the input circuit, and he ascribed that result to the fact that the space between the filament and the grid has unilateral conductivity. Thus, unlike Lowenstein and Mathes, the distortion which Colpitts sought to eliminate was that which arises in the tube itself, as distinguished from one arising in the circuits.

It seems that Colpitts, not unlike Lowenstein, was not fully acquainted with all the theoretical conditions under which the audion operated. So much was admitted by Mr. Waterman. But however imperfect his theory may have been, he sought and obtained a desirable objective in eliminating the distortion created within the tube. Colpitts evidently thought that the audion would repeat only one-half of the signal wave; that is, the positive half wave. Apparently Colpitts knew only the soft tubes. Such tubes as have been indicated could not be operated at higher plate voltages, and of them it is true that, when operated at the lower plate voltages

and with zero grid bias, they would much more effectively repeat the positive half wave than the negative half wave of the signal. Colpitts, therefore, sought to have both half waves repeated in such fashion that each half necessarily derived from the grid would disappear in the final amplified product. In effect, Colpitts succeeded in curing the grid defects of one tube by the grid defects of a second by placing the input or grid circuits of the two tubes in divided input relation.

Fig. 1 of the patent represents the system of circuits employed. Two audion elements are combined and included in each of the circuits. Incoming and outgoing conductors are represented by the wires 1 and 2 terminating in the primary winding 3 of an input repeating coil 4, and the wires 5 and 6 terminating in the secondary winding 7 of an output repeating coil 8. The secondary winding of the repeating coil 4 is divided into two coils 9 and 10, and the primary winding of the repeating coil 8 is divided into two coils 11 and 12. The audions comprise two heated filaments 13 and 14, two plates 15 and 16, and two grids 17 and 18. The filaments are heated from the single battery 19, shunted across their connected terminals. In the output circuit, the primary coils 11 and 12 of the repeating coil 8 has included within it a battery 21.

The arrangement of audions in this Colpitts patent led to its designation as a "push-pull" arrangement. It is the contention of the plaintiffs that, though the term "push-pull" was known to the art, the invention of Colpitts has given it a new and specific meaning. In effect it means, as they contend, the arrangement of two three-electrode vacuum tubes with divided input and divided output circuits.

Claims 1 and 5 are in issue. They read as follows:

"1. An electric wave repeating apparatus comprising divided input and divided output circuits, means for producing two ionized streams, said streams being oppositely included in said output circuit, and two electrodes for controlling said ionized streams respectively and oppositely connected in said input circuit."

"5. In an electric wave repeating apparatus, the combination of two repeating elements comprising ionizing means, an anode and an input electrode for each said element, an input repeating coil the secondary winding of which is connected at an intermediate point to said ionizing means and at its opposite terminals to said input electrodes respectively."

The defendant resists Colpitts' claims on the ground that they are not the result of invention. It is contended that Colpitts stated no new combination and no new mode of operation. It is said that the only thing Colpitts did was to substitute a new type of telephone repeater, i. e., the audion, in an old telephone circuit, and that the whole and only novelty of the arrangement of Colpitts lies in the audion repeater, and not at all in the combination.

The defendant in support of this proposition relies first on the push-pull telephone circuits shown in the prior art patents of Dean, Kitsee, Stragiotti, and Grissenger. The defendant's position is that this part of the prior art shows two mechanical telephone repeaters connected back to back and fitting into a common output transformer, and that the operating function of such arrangement was to tend to balance out in the input transformer the distortions produced by the imperfect operation of the two repeaters, respectively.

One's first reaction to these mechanical repeaters is that they have no element corresponding to the grid of the audion, and necessarily, therefore, show no provision for connecting such elements in a divided input circuit.

Mr. Waterman said of the devices of these patents that they have this in common: "That they depend upon compression and decompression, either by air waves or by the vibration of a diaphragm, or reed, in response to telephone currents applied to a magnet, so that the resistance is simultaneously increased on one side and decreased on the other side of the vibrating member."

Mr. Waterman contends, and I think with much force, that as illustrated by Professor Bowles' oscillograms, the current brought about by compression is quite different from the current brought about by release of compression. I think it is too much to contend successfully, as Professor Bowles seeks to do, that the double opposed carbon button devices resulted in cancellation of distortion in individual waves by virtue of the back to back arrangement through a common transformer circuit or output.

In his discussion of the carbon button repeaters of the prior art, Professor Bowles made much of the Shreeve repeater; but I think the result was unfortunate. It seems to me that the cross-examination on this

Shreeve patent made most convincing the proposition that the substitution of audions for carbon button repeaters required invention.

The Shreeve repeater, as appears from the Gherardi and Jewett Paper, in the early days was a useful device and, perhaps, the best repeater available until the audion was developed. These writers, however, point out that "an inherent defect in this type of instrument is the fact that the sensitiveness falls off rapidly when the input energy is below a certain minimum. * * *. Thus at one moment the repeater in a given circuit may be handling the energy from two persons speaking loudly, using telephones very near the terminal of the circuit, while at the next moment it may be called upon to function with the energy which it receives from telephones connected to long circuits, which in turn connect to the circuit with which it is associated. If the persons using the telephones in this latter case have weak voices, if they do not use the telephones properly by talking directly into the transmitter, or if the apparatus or lines themselves are inefficient, it is clear that the energy at the repeater terminals may be many times less than that in the previous case. Further under those conditions maximum amplification is the more to be desired so that a repeater element whose performance fluctuates with the amount of energy which it receives and particularly one whose performance is worse when operating with the smallest energy is subject to a handicap when it comes to applying it generally in the telephone plant."

Now, Professor Bowles took the Shreeve patent, No. 1,156,636, and sought to place two of these carbon button repeaters back to back, with the thought, doubtless, that all Colpitts had to do was to substitute two audion elements for the Shreeve repeater. What he did was extremely ingenious; but Mr. Waterman pointed out that the Bowles' arrangement would be inoperative because the signal could not get to the carbon button elements at all, as the condensers, which are essential to the operation of the Shreeve repeater, when put together, would short circuit the audion frequency current; and moreover, that the circuits are such that, even though alternating currents were produced in the elements 26–26, those currents would be short circuited within the output coil.

Patents to Hewett, No. 749,791; Taylor, No. 953,361; and Arnold, No. 1,118,173, form another group of patents relied upon by the defendant in this art to prove lack of patentability by Colpitts. These patents relate to mercury vapor arc devices.

Gherardi and Jewett wrote: "This arrangement, which is essentially a very insensitive unilateral repeating device, has never, so far as is known, been made to function as a telephone amplifier. In addition to its inefficiency, this arrangement is undesirable because of noise, distortion and variable amplification."

Of the Arnold arc, Gherardi and Jewett wrote: "This gaseous device is capable of good amplification and is fairly free from distortion except such as may be introduced by the fact that impedance of the electromagnet may not be identical with that of a telephone line. It was tried out experimentally on telephone lines but has never been used for any length of time and then only under special engineering supervision. For example, units were installed on the important long distance circuits between New York and San Francisco but were never used commercially."

Of the Taylor device, as well as that of Arnold, it may be said that it shows no divided input control. The control elements of Colpitts are missing, and it does not appear that the two input circuits could be opposed to remedy the inaccuracies of their control effects.

In brief, it would appear that the mercury vapor arc devices do not anticipate the Colpitts patent.

Finally, in the discussion of the prior art of the Colpitts patent as indicating a third type of reference, it is necessary to consider the Gerdien patent, No. 1,004,012. This patent shows a Geissler tube. This tube requires a high voltage for operation, and produces a characteristic cathode dark space. It has no heated filament. Gerdien sought to control the dark space by causing the current carriers to adopt spiral paths. Changes in these carrier paths changed the resistance within the tubes. The Gerdien tube is a strictly two-element tube. It shows no unilateral conductivity, and the batteries, therefore, may be poled either way. There is no divided input to the control element.

I have great difficulty in seeing how the Gerdien tube suggests the Colpitts invention. Gerdien was apparently interested in controlling or counteracting the sluggishness of the Geissler tube. A Gerdien tube is different in construction from that of the three-electrode vacuum tube. It certainly does not anticipate the claims of the Colpitts patent.

I am of opinion, therefore, that the Colpitts patent is valid and infringed.

The patent in suit, No. 1,504,537, to Arnold, technically viewed, presents the greatest difficulties. The two scientific opinions, opposed almost on every fundamental matter involved, are in the utmost discord.

The patent is entitled for an improvement in power limiting amplifying devices. The original application was filed September 3, 1915. It was allowed November 18, 1920. On May 15, 1921, the application was declared in interference with an application of Dr. Alexanderson; on February 9, 1922, the application was allowed. On June 28, 1922, the applicant presented a petition for the entry of an amendment. The petition for the filing of the proposed amendment was, on June 30, 1922, denied. Another petition for amendment was submitted on July 31, 1922. On August 2, 1922, another petition for leave to amend was filed. On August 7, 1922, an office action was adverse to the amendment, but contained a statement that proposed claims 31, 32, 36, 37, and 39 appeared to be allowable. Then apparently the application lapsed, but was renewed on September 14, 1922, and finally issued on August 12, 1924.

The foregoing detailed reference to the history of the case is made necessary because of the defenses which are vigorously asserted.

The claims involved are in two groups. Claims 17, 18, and 20 form one group, and claims 33 to 36, inclusive, the second. The former group was referred to throughout the trial as the "high impedance" claims, while the latter group was designated the "push-pull loading" claims.

As to the former claims, defendant's position is that they are invalid for lack of novelty; and that the defendant does not infringe because defendant's system is derived from the prior art, and not from the disclosure of the Arnold patent.

Claims 17, 18, and 20 read as follows:

"17. An amplifier comprising two electrical discharge devices, input and output circuits therefor, said devices being symmetrically and oppositely disposed with respect to each of said circuits, space current paths for said devices, said paths having a common external portion of high impedance."

"18. An amplifier comprising two electrical discharge devices, input and output circuits therefor, said devices being symmetrically and oppositely arranged with respect to each of said circuits, space current paths for said devices, a source of space current therefor, said paths having a common external portion, and means associated with said source for preventing fluctuating currents therethrough."

"20. A repeater comprising two electric discharge devices each having a cathode, an anode and an impedance varying element, a connection between said impedance varying elements, a connection between said cathodes, a connection between said anodes, an electrical impedance in one of said connections, an electrical impedance in another of said connections, other connections from intermediate portions of each of said impedances to one of said first mentioned connections, one of said last named connections being provided with a source of current, and means tending to maintain a constant supply from said source."

The Arnold patent discloses a radio receiver consisting of antenna, a radio frequency amplifier stage, a conductor stage, and an audion amplifier. So far as this suit is concerned, it is sufficient to consider only the audion amplifier.

The third or output stage of this amplifier has two tubes arranged with a divided input and divided output circuits such as is shown in the Colpitts patent. This final stage is preceded by means of a single tube amplifier. The specification states:

"The thermionic repeater being unilaterally conducting, the repeater element 48, 49, 53 can transmit positive current due to battery 65, only in the direction from 53 to 48. Also, element 50, 51, 52 can transmit positive direct current only in the direction from 52 to 50. If these currents are approximately equal, it follows that the maximum variation in current around the circuit 48, 53, 54, 52, 50 can never exceed the magnitude of the normal current in either element, provided none of this varied current can pass through that part of the circuit of the battery 65 which is common to the two thermionic elements. To prevent any appreciable passage of variable current the high resistance 58 is used."

"The variations in the normal currents in the winding 55, which variations constitute the signals to be received, are produced in the usual way by the action of the grids 49 and 51, across which the signal voltage is impressed, so that it is obvious that an impressed voltage of large value, tending to produce a large variation of current in the power limiting device, cannot cause an alternating or varying current in winding 55 larg-

er than the normal space current of the elements. This normal space current is adjusted until its value is just greater than the amplitude of the signals to be received."

The specification then shows that the resistance 58 prevents unbalancing of currents in the two halves of the winding 54. In the operation of the circuit, it appears that a choking effect will be produced by the resistance 58, with the result that, as the grid potential becomes greater, more current is diverted to the grid, and a point is finally reached when no measurable increase in anode-cathode current is produced by increasing the grid potential, so that, if the maximum amount of current is made approximately equal to the current required to transmit the signal, the interfering sounds such as may arise from varied accidental causes cannot be of greater intensity than the sound to be transmitted.

Another function of the Arnold impedance 58 is effected with the elements 56 and 57. Condenser 56 and choke coil 57 tend to prevent fluctuations of current from the source 65, the battery, from reaching the two tubes.

The defendant urges that the inductance L3 employed in his apparatus is quite different from the resistance 58 and is similar to an inductance shown in the Stragiotti patent. The argument is that choke coil L3 is an inductive impedance; that it resists a tendency to change the current in a common wire, as it is the function always of an inductance to resist any change in current flowing through it, and to that extent it does counteract any lack of symmetry in operation of the vacuum tubes V3 and V4 (see Exhibit P–13), and thus aids in producing a distorted output.

It is asserted that this same use of a stabilizing inductance is shown in Stragiotti patents 958,561, 954,402, and 953,107; also that the same inductance is shown in Goddard patent 1,159,202, in Gerdien patent 1,004,012, and in a prior patent to Arnold, 1,168,270.

At the same time, it is urged that Arnold's impedance 58. is in fact a high ohmic resistance, not an inductive resistance, and is, therefore, not effective to prevent sudden changes in current flow through the common path, such as is the purpose of the inductance used by the defendant.

In so far as the effect of element 58 is concerned, whether described as a "high resistance" or "resistance," as appears in the specification, or as a "high ohmic resistance,"

as the defendant argues, the matter to be determined is whether this element 58, as shown in the specification and drawings, was in fact an impedance as defined in the claims.

I understand that the term "impedance" is sufficiently broad to include anything which impedes the flow of electric current. It was so defined by Mr. Waterman. A resistance, certainly, in that sense is an impedance. Arnold is concerned in cutting down the voltage and limiting the current available in the plate circuits of three-electrode tubes. Even if, as defendant contends, impedance 58 is not an inductive resistance, it does succeed in performing the result set forth in the patent, and thus is an impedance.

Does the defendant escape, while using a different kind of resistance, if the effect of such resistance is exactly the same as in the Arnold combination? That, it seems to me, is the critical question involved in the matter of infringement. Is the element L3 of defendant's apparatus the equivalent of the impedance 58? It may very well be that in the research and experimental work of Dr. Arnold, to meet a specific problem which he then had in mind, he used a high ohmic resistance; but his specification is not so limited, and, when the application for the patent was prepared, there was a rephrasing or restatement of his own experimental memorandum (Exhibit D–51), so that he stated: "In the preferred form of this device the unilateral conductivity is secured by causing part of the circuit to lie in the paths of thermionic currents between hot cathodes and cold anodes, said thermionic currents being oppositely directed with respect to said circuit. These thermionic currents are caused to flow by impressing upon their limiting electrodes, in multiple, an electro-motive force operating through a high impedance, said high impedance being essential to the operation of the device for the purpose specified, by preventing unbalanced currents in the two halves of the device."

And again, in the amendment of June 14, 1918, there was inserted: "To prevent any appreciable passage of variable current the high resistance 58 is used."

■ I think it cannot be successfully urged that there was not a sufficient disclosure of the functions of the impedance 58; and, of course, it is old doctrine to state that, even if the patentee does not appreciate or understand the advantages which are inherent in his combination, the validity of his claims is not affected. General Electric Co. v. P. R.

544

Mallory & Co. (C. C. A.) 298 F. 579; Armstrong v. De Forest Radio Tel. & Teleg. Co. (C. C. A.) 280 F. 584.

Finding as I do that the defendant's apparatus embodies an impedance which controls sudden impulses exactly in the same way as Arnold impedance 58, the defendant cannot avoid infringement by tracing his form of resistance, i. e., inductance, to the prior art, unless indeed such prior art shows the combination of the Arnold system.

Considering the cited patents of such art, it appears that the Stragiotti patents relate to mechanical repeaters. They are not electrical discharge devices; they do not have space current. Stragiotti employs a bilateral conducting device. None of the Stragiotti disclosures reads on these impedance claims, and there is no disclosure of an impedance in the common portion of the plate circuits of a three-electrode vacuum tube amplifier having divided input and divided output circuits.

Gerdien patent No. 1,004,012 relates to a flow discharge device. He discloses a resistance to prevent the flow discharge from becoming an arc. The inductance which he employs prevents variations of voltage. It is clear, though, that the Gerdien tube is different in character from an audion. The former has no electrostatic control element corresponding to the grid. It has no cathode. It conducts current in both directions. The disclosure of Gerdien cannot be read on the Arnold claims.

Taylor patent No. 953,361. The resistance shown in this patent is for an arc device. Here again it may be noted that Taylor was not dealing with the three-electrode tube. At the time of the Arnold invention in 1915, there was so much unknown about the operation of a three-electrode tube, so much is admitted by Lowenstein and Colpitts, both men of high standing in the art, that it seems to me that it involved much more than engineering skill to take here and there from the prior art and adapt an impedance, as Arnold did, to the Colpitts push-pull arrangement. It is for this reason that such a mercury arc relay, as shown by Taylor, must be dismissed.

Since defendant's main reliance as to this art was on the Stragiotti, Taylor, and Gerdien patents, further consideration of the prior art, as bearing on the impedance claims, will be unnecessary. Hence I conclude that the impedance claims are valid and infringed.

We now come to the second branch of the Arnold patent; those claims which have been referred to as the "push-pull loading" group. These are claims Nos. 33 to 36. Claim 36 may be taken as a typical claim. It reads as follows: "36. In combination, three electron discharge tubes, means for supplying discharge current to said tubes, two of said tubes being connected in push-pull relation, the other one of said tubes being arranged to impress amplified signal waves on said push-pull connected tubes of such amplitude that at the peak amplitude of said waves, for a given half-cycle the resultant momentary decrease in the normal discharge current through one of said push-pull connected tubes reduces the discharge current through said tube near to zero."

Arnold took the Colpitts circuit of a back to back arrangement of audion tubes and preceded it by means of a single tube amplifier stage. He sought to design a power-limiting, repeating, and amplifying device, particularly adapted for use in radio communication. His discovery seems to have been that a single tube thus used followed by a Colpitts push-pull stage was effective in loading to the greatest possible point. The output of the audion frequency amplifier 38 is by means of the transformer 44–45 supplied to the push-pull stage. Input and output circuits of the two push-pull tubes are divided, as in the Colpitts scheme. The divided output circuits are traced from the plates 53 and 52 across the spaces within the tubes to the filaments 48 and 50, thence by a common lead through the battery 65, inductive impedance 57, impedance 58, to the meeting point of the winding 54, back to the plates 53 and 52. The condenser 56 is shunted across the plate battery 65 and the impedance 57. These elements 56 and 57 act as a filter for keeping fluctuating currents of the battery 65 out of the tubes. This action is aided by impedance 58. This function of the impedance 58 is in addition to its other functions heretofore discussed.

If claims 33–36 are valid, apparently infringement of them is not questioned. It is most forcibly asserted, though, that the subject-matter of the claims was not invention; that the combination was not original with Arnold; that the subject-matter in these claims was new matter inserted after the filing of the Arnold application; that the claims are invalid because they were presented in a renewal application which was not for the same invention as the forfeited application; and finally, because no application

for this alleged invention was made until more than two years after the publication of Arnold's Canadian patent, which it is thus contended constitutes a statutory bar.

Considering these defenses in the order in which they have been stated, the defendant argues that De Forest's original disclosure to the engineers of the plaintiff, including Colpitts, showed two audion amplifiers in tandem arrangement; also that Grissenger in the carbon button art disclosed an ordinary carbon button telephone transmitter amplifier, fitting into a double button, back to back, push-pull amplifier; and that Colpitts in his patent in suit, in Figs. 3 and 4, shows a carbon button telephone transmitter amplifier 48 fitting into a push-pull arrangement of audion tubes.

But in measuring Arnold's conception, the appraisal must be as of the time when he made the invention. It is no exaggeration to state that even the highly gifted engineers of the period had no complete understanding of the operation of the audion. In the matter of evaluation, so far as this suit is concerned, what those men did must not be interpreted in the light of present day knowledge. Granted, therefore, that De Forest in 1912 showed in his sketch a tandem arrangement of audions, the art had not so far advanced in 1915, even with the valuable contribution of Colpitts in 1914, to make the Arnold arrangement of his particular two stage amplifier obvious to those skilled in the art. If the famous Dr. Alexanderson showed tandem push-pull amplifiers and also single tube stages arranged in tandem, as he did in his patent 1,173,079, it cannot be argued successfully that the method elected by Arnold to bring about his result was the only thinkable way of securing such result.

So, too, it seems to me it required an inventive act to jump from the arrangement shown in the Grissenger patent 1,198,212 and the Colpitts patent in suit, however well known those arrangements may have been to Dr. Arnold, to the particular stages of amplifiers shown by him. Arnold sought and apparently obtained that which was both amplifier and power limiter. Whether the carbon button telephone transmitter shown in Grissenger and Colpitts is in fact an amplifier may be doubted at least in the sense in which Arnold uses the term.

It is next maintained that it was Colpitts who suggested, in 1913, this particular arrangement to Arnold. The Colpitts' sketch is a part of Exhibit D–74. It shows a plural stage amplifier. This sketch embodies the Arnold repeater (the mercury arc repeater device which was known in the laboratory of the plaintiffs), or a suggested audion with magnet control in push-pull arrangement with current supplied through a retardation coil. The output circuit is connected with two condensers to the grid of an audion shown at the right of the sketch. This audion, Mr. Colpitts testified, is shown with a push-pull connection; but I think that this reference shows no more than a proposal by Colpitts for interposing a specially constructed large audion or a number of small audions in parallel, as an impedance transformer. He testified, page 20, Exhibit D–74:

x–Q. 19. What is the significance in Colpitts' Exhibit No. 1 'use one large or a number of small audions in parallel'?

"A. As far as practical operation is concerned, it is immaterial whether one large audion be made up with say an impedance of a thousand ohms, or eight audions with say an impedance of eight thousand ohms, and these eight be used in parallel in the sense that their grids are electrically connected and their plates electrically connected so that in effect the eight act as one element."

Whatever Colpitts disclosed in his sketch fell short of showing the use of a single three-electrode tube in advance of his divided input arrangement of push-pull three-electrode tubes. One would look for this in the Colpitts patent 1,129,959, which was the outcome of the interference proceeding in which he gave the testimony just quoted; but though the defendant cited this patent against the Arnold patent, it was not offered in evidence.

The third, fourth, and fifth defenses may be considered together.

In effect, the determination of the sufficiency of these defenses rests upon a proper interpretation of the scope and the meaning of the original application, though there are other questions involved.

The defendant contends that Arnold's conception of his invention was disclosed in Plaintiffs' Exhibit 51, and that this disclosure, as well as the application as originally filed, showed that Arnold was mainly concerned with obtaining a power-limiting effect such as he did achieve by putting in the resistance 58 of the patent (k of the memorandum, Plaintiffs' Exhibit 51) in a common wire of the push-pull circuit, loading the circuit so that it became incapable of delivering an output current greater than that of normal speech, irrespective of the increase of the input current. So that, the defend-

546

ant argues, the power-limiting arrangement was the whole stated purpose of his invention as originally described and claimed, and the effort to retransform the power-limiter to an amplifying device was no part of his original invention but a mere after-thought, improperly added to the disclosure in the course of the prosecution of the application.

It thus becomes necessary to read the original specification in order to ascertain whether the subject-matter of the push-pull loading claims have a sound basis therein.

In the original application, the inventor states:

"This invention relates to receiving systems for radio communication, particularly to devices for limiting the electrical power which may be transmitted to a receiving instrument in such a system, and more particularly to devices in which such limiting action is obtained by employing electric currents in an evacuated vessel."

"An object is to provide rapidly responsive means by which a definite upper limit is set upon the amount of power which may be communicated to a receiving circuit or apparatus. * * * "

There, follows a detailed description of the device and of the circuits, including the operation of the system, without setting forth any additional object of the invention.

The claims as originally filed were five in number, of which the first and third must be considered important. They are:

"1. A receiving system for radio communication comprising an antenna, a tuned receiving circuit connected therewith, means for amplifying the power of waves communicated to said tuned circuit, means for rectifying said waves of amplified power, means for amplifying said rectified waves, translating means responsive to said rectified waves, and means including thermionic elements for limiting the power transmitted by said waves to said translating device."

"3. A receiving system for radio communication comprising an antenna, a receiving circuit connected therewith, means for amplifying the power of waves communicated to said circuit, means for rectifying said amplified waves, means for amplifying said rectified waves, translating means responsive to said rectified waves, and a power limiting device comprising a thermionic repeater with divided input and divided output circuits, a high impedance path containing a source of electro-motive force connected in the output circuit of said repeater and transformer

windings for connecting said output circuit to said translating means."

These claims certainly not only include amplifying means as elements of the combination, but, in addition, means for amplifying the rectified waves, as well as, of course, the means for limiting the power transmitted to the translating device. The means for amplifying the rectified waves must be the tube 38, which is called an amplifier in line 50, page 2, of the patent, together with the two audions in push-pull arrangements, the parts of which are designated 48, 49, 53, and 50, 51, and 52, respectively.

It is certainly true that though none of the original claims was limited solely to the combination of any of the claims 33 to 36, inclusive, nevertheless, every element of the combination is set forth in the drawing of the original application, and is described in the specification.

The inquiry, therefore, narrows itself to this proposition of law: Does the fact that the applicant omitted to state, as an object of his invention, the result attained by a particular combination of elements, and not claimed in the original specification, bar him subsequently from obtaining a valid claim which does embody such combination of elements and no others? Incidentally, it may be noted that the original application, while failing to specify the amplifying effect of the device as an object of the invention, did, nevertheless, in distinguishing the invention from that covered in a pending application of Dr. Arnold, state: "It differs from that, however, in that additional elements are associated with the unilateral devices,[2] and elsewhere, to secure certain improvements in operation, as explained later in this specification, *and also in that an amplifying effect is obtained which makes this device particularly applicable in radio communication.*" (Italics mine.)

The loading function described in the application as originally filed is shown also by Arnold's statement that "this normal space current is adjusted until its value is just greater than the amplitude of the signals to be received."

The above passage refers to the final stage of amplification.

I think it must appear, therefore, that the disclosure in the original application of the amplifying effect of the push-pull loading claims was complete.

[2] The audions.

From the file wrapper and contents (Defendant's Exhibit 31) it appears that the application was allowed on November 18, 1920, before any such subcombination claims had been presented. Thereafter, the application was withdrawn from issue by the Patent Office pending the determination of an interference proceeding with Dr. Alexanderson. Then on February 9, 1922, allowance was had, but, before the issuance of the patent, the applicant, on June 28, 1922, under the provisions of rule 78 of the Patent Office, without withdrawing the application for issue, filed an amendment setting forth the claims which have been designated the push-pull loading claims, and, with this amendment, filed an affidavit as required under rule 48 of the Patent Office, to the effect that the subject-matter of the amendment as well as certain prior amendments to the application, was a part of the original invention. It was recommended by the Examiner that the proposed amendment be not entered, and claims for the push-pull loading 'combination were declared to be unpatentable because of references to the prior art.

Thereafter, on a petition filed August 2, 1922, Arnold sought the entry of an amendment still embodying these push-pull loading claims. On August 7, 1922, the Examiner again recommended that the amendment be not entered, though the Examiner declared claim 36 of that amendment, which is the claim of the same number in the patent in suit, appeared to be allowed. Then the application lapsed under the notice of allowance of February 9, 1922, and a renewal application was filed on September 14, 1922, wherein, by amendment to the application, the push-pull loading claims were again included, this time also accompanied by a supplemental oath of the inventor. Thereupon, in due course, the application was allowed and issued in its present form as a patent.

■ It is, of course, well-settled law that no new claim can be allowed unless it is for the same invention as that disclosed in the original specification. Chicago & N. W. R. Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Eagleton Mfg. Co. v. West, B. & C. Mfg. Co., 111 U. S. 490, 4 S. Ct. 593, 28 L. Ed. 493; but it is equally well settled that, where the original specification and drawings support the claims finally made, such claims may be made by amendment of the original application. Hobbs v. Beach, 180 U. S. 397, 21 S. Ct. 409, 45 L. Ed. 586.

It would be inequitable not to give the inventor that monopoly right which his original disclosure entitled him to claim, if he makes timely effort to secure such right. General Electric Co. v. P. R. Mallory & Co. (C. C. A.) 298 F. 579; Kintner et al. v. Atlantic Communication Co. et al. (D. C.) 249 F. 73; Morgan Engineering Co. v. Alliance Machine Co. (C. C. A.) 176 F. 100.

Since I believe the subject-matter of the claims is found in the original disclosure, I am of opinion that the Patent Office properly admitted the claims to allowance.

■ The remaining objection is that these claims were not made until more than two years after the publication of Arnold's Canadian patent.

The Canadian application (Exhibit D-28) was filed May 22, 1916, and the patent issued October 9, 1917. The specification is substantially identical with Arnold's original application for the patent in suit. The claims, however, in the Canadian application are twelve in number, though none of them is limited to the subcombination of claims 33–36 herein. This patent was surrendered December 23, 1920, and patent No. 226,704 was issued in its place on November 28, 1922. The latter patent is not in evidence.

Defendant relies on section 4886 of the Revised Statutes (35 USCA § 31) which authorizes the issuance of a patent only if the subject-matter thereof was not patented or described in any printed publication in this or any foreign country more than two years prior to the United States application. Defendant insists that this is effective as against Arnold, inasmuch as the renewal application was not made until 1922. The defendant's position would undoubtedly be sound were it not for the fact that the renewal application dates back to the date of the original invention.

An intervening public use, more than two years prior to the filing of the renewal application, has been held not to work an abandonment or bar. This was decided in Detroit Iron & Steel Co. v. Carey, 236 F. 924, by the Circuit Court of Appeals for the Sixth Circuit, certiorari denied 242 U. S. 649, 37 S. Ct. 242, 61 L. Ed. 545, and in the Diamond Power Specialty Corporation v. Bayer Co. (C. C. A.) 13 F.(2d) 337, it was held that a publication of the claimed invention which occurred more than two years prior to the filing of the renewal application was not a bar. In that opinion, the Circuit Court of Appeals for the Eighth Circuit distinguished between an abandonment of an invention and forfeited application for letters patent resulting from nonpayment of the fee, for in

the latter case the statute saves the abandonment by reserving to the applicant the right to renew his application within the statutory period.

In effect, this means that when the Canadian patent was issued there had been no actual or constructive abandonment by Dr. Arnold of any of his rights, under the application then pending, for the patent in suit; and the issuance of the Canadian patent worked no forfeiture of any of his existing rights. Among those rights was that of amendment of his application, and indeed, of renewal on allowance, if such renewal were made within the statutory period.

I conclude that the claims in issue of the Arnold patent are valid and infringed.

The last of the patents in suit is that to Blattner, No. 1,483,273, issued February 12, 1924, on an application filed October 4, 1920. The invention relates to a circuit for heating filaments of audions. Unlike the inventions of the patents heretofore discussed in this litigation, Blattner's work must be judged by an advanced state of the audion art. By 1920, the telephone and other electrical engineers, by extensive research subsequent to the De Forest disclosure in 1912, had added greatly to the knowledge of the structure, operation, and adaptations of the three-electrode tube.

Blattner, who sought a circuit wherein the fluctuations of the cathode heating frequency are suppressed without necessitating the use of a transformer, made specific reference to the work done by at least one of his predecessors in the field.

White, in patent No. 1,195,632, addressed himself to the problem of using alternating current for heating the filaments of vacuum tubes. He said: "In the practical application of my invention, current for heating the filament is obtained from the secondary of a transformer and the connections from anode and grid to the cathode are made to the middle point of the secondary winding. When the connections are made in this way the average difference of potential at any instant between different portions of the cathode and the grid and anode, due to the heating current, will be zero."

Also, before Blattner filed his application, Heising, in patent No. 1,432,022, described a circuit for heating a filament by alternating current, wherein he employed an impedance 52 shunted across the secondary winding 36 of the power transformer, and a mid-tap connection for the grid and plate cir-

cuits on this shunted impedance. He said: "In some cases, however, it may be inconvenient or impossible to make a connection to the middle point of the transformer secondary 36. Accordingly, there is placed across the terminals of said secondary an impedance or choke coil 52, and from the middle point of this impedance 52 a connection is made to the point 32 common to the input and output circuits of the amplifier system."

Now Blattner, referring to the White patent which had issued and making no reference to the Heising circuit, though the latter was described in Canadian patent No. 188,399, issued January 21, 1919, said: "Furthermore, instead of employing a compensating circuit which is individual to each cathode, as in the patent, the present invention provides a compensating circuit which is common to a plurality of vacuum tubes. In case it is desired to apply the arrangement to a push-pull tube circuit wherein two tubes are connected in opposition in the same circuit, an impedance may be connected in shunt to the two cathodes, taps being taken from the midpoint of this impedance to the anode and control electrodes."

The impedance referred to is the element 14 of the Blattner circuit, and it seems to me it is the same as the impedance coil of Heising, designated 52 in Fig. 3. These two elements are both shown in circuit with the filaments of two tubes, the only difference being, apparently, that Blattner's use is in a push-pull arrangement of the device, whereas the Heising tubes are in parallel.

Sometime after the Blattner application had been pending, almost two years thereafter in fact, he filed an amendment to his application, now embodied in lines 7 to 30, page 2 of the patent, and added claims 5 to 8, inclusive. This amendment, including the claims, if taken at face value would seem to broaden the original Blattner conception, for as one reads the application as filed, including the claims, apparently they related to a three-element combination: (1) A plurality of three-electrode tubes; (2) A source of alternating current for heating the cathodes; (3) A compensating circuit, to the cathodes.

There were certain alternative forms presented referred to in the specification, for though the invention is stated to refer broadly to "a plurality of vacuum tubes," the inventor adds: "In case it is desired to apply the arrangement to a push-pull tube circuit wherein two tubes are connected in opposition in the same circuit, an impedance may be connected in shunt to the two cathodes,

taps being taken from the midpoint of this impedance to the anode and control electrodes."

It is argued by Mr. Waterman that the impedance referred to in this passage may be omitted; in the amendment of August, 1922, it is stated to be desirable for overcoming any lack of compensation "due to lack of symmetry or balance between the two halves of the push-pull circuit." Blattner's description of the operation of the circuit makes repeated reference to the impedance 14. If claims 5 to 8 are to be held valid, it seems to me that they should be so construed as to include the impedance as a necessary means for the attainment of the object sought in the circuit.

The plaintiffs do not give this construction to the claims, and argue that the impedance can be omitted, and so the combination set forth in these claims involves only the two vacuum tubes in push-pull relation and a source of alternating current for heating the cathodes. If these claims were as broad as that, then undoubtedly the defendant would infringe, because, although the defendant uses a three-element combination, infringement could hardly be avoided if the third element brought about no different result.

The defendant not only contests this interpretation of the scope of the claims, but also asserts that he follows White rather than Blattner. Though the defendant uses alternating current for heating push-pull combination tubes instead of but a single tube as in White, he does use a three-element combination in which the compensating circuit of White is included. This, indeed, Mr. Waterman seemed to admit when on cross-examination he testified:

"Q. And White attains this balance to wipe out the fluctuations of the alternating current by connecting the middle of the transformer to the filament, does he not? A. For a single tube, yes.

"Q. That is, he uses precisely the same arrangement for wiping out the fluctuations in a single tube that the defendant uses in two tubes? A. Oh, no.

"Q. Why not? A. Because the defendant—oh, in two tubes, yes. But the essence of the matter is the two tubes. In other words, you could not take one of defendant's tubes and do away with the other and get the freedom from noise.

"Q. What I am asking you, Mr. Waterman,—I wanted simply a straightforward answer—is this: Isn't it true that the defendant uses, for feeding alternating current to the filaments of his push-pull amplifier, precisely the same compensating circuit that White disclosed? A. With the very important difference that I have noted, yes.

"Q. The difference being that the defendant uses the same instrumentality for feeding the two filaments that While used for feeding one? A. Yes."

At the time of Blattner's conception, I doubt whether, if White showed means for heating the filament with an alternating current for a single tube, it was an inventive act of Blattner to adopt those means (in view of the disclosure of Colpitts and of Heising) to a push-pull arrangement of tubes, even though by his arrangement but a single transformer, as Mr. Waterman contended, is necessary, in contradistinction from White.

And, indeed, Blattner himself must have evaluated his own thought in pretty much such terms, for he said: "Although the invention is set forth particularly with reference to a push-pull amplifier employing two tubes, it is to be understood that a single tube may be used instead, after the fashion disclosed, for instance, in the patent to E. H. Colpitts, No. 1,128,292, February 16, 1915, entitled 'Electrical wave amplifier.'"

For the foregoing reasons, I believe that the defendant does not infringe the Blattner claims in issue.

In addition to the matters of validity and infringement heretofore discussed, the answer sets up two special defenses: The first, an estoppel as against all of the patents in suit alleged to arise out of a license from plaintiff Electrical Research Products, Inc., to the Vitaphone Corporation on April 2, 1927, as amended by the agreements of October 20, 1928 and December 14, 1928, and similar licenses to three other producers of sound moving picture films, Metro-Goldwyn Mayer Corporation, United Artists Corporation, and Firnatone Corporation. These licenses were referred to in the trial as producers' licenses. The second defense, set up in paragraph 27 of the answer, is a license alleged to inure to the defendant from the purchase and use of licensed tubes. Since this latter license is a defense only to the Lowenstein patent in suit, and inasmuch as this opinion holds the Lowenstein patent to be invalid, there is no need to discuss this defense, although the questions presented are a matter of unusual interest.

As to the producers' license, it appears that the Electrical Research Products, Inc., licensed these producers under all the patents in suit to use electrical sound recording equipment in synchronism with the projection of motion pictures on recording equipment supplied to them by the Products Company; and the license also enabled the licensees to distribute and lease such sound records so produced to such exhibitors as were licensed by the Products Company to use its reproducing equipment.

By amendments of the contract, this limitation was eliminated, and in its place the following provision was incorporated: "Licensee recognizes the highly technical nature of the methods, systems and equipments covered hereby and of the art of recording and reproducing sound for the purposes herein contemplated, and that the production of sound records under the licenses herein granted and the reproduction of sound from such records by the use of equipment, or with methods or systems other than those supplied by Products may produce results of such inferior quality as to seriously impair the prestige and business reputation of the parties hereto, and also that uses of said equipment otherwise than as herein licensed may involve infringement of the patent rights of third parties; therefore, in order to secure and insure the proper production and reproduction of sound records to the satisfaction of the parties hereto, Licensee agrees that it will use the recording equipment to be leased to it by Products as herein provided, pursuant to the methods and systems and in the manner prescribed by Products from time to time and that it will not distribute sound records made hereunder for use with, on, or in connection with, reproducing equipment not furnished or licensed by Products, unless such other reproducing equipment operates properly, reliably and efficiently and reproduces sound from the sound records made by Licensee with adequate volume and of quality equal to that obtained by the use of equipment supplied by Products."

It is conceded that the only use made of the defendant's apparatus was in exhibiting sound records made by the producing companies under their licenses with the Products Company. It should be noted too that the alleged infringement herein, occurred during the time that the Vitaphone Company's license was in full force and effect, and apparently after the limitation to exhibitors, as stated in the original agreement, had been supplanted by the provision of October 20, 1928, also heretofore referred to.

The defendant proves, also, that on February 19, 1929, the Vitaphone Company notified the Products Company that it purposed to permit its productions to be used in defendant's theatre in Buffalo, wherein sound reproducing equipment other than that of the plaintiffs had been installed.

As an additional element of the estoppel claimed by the defendant, it appears that all of the payments and royalties to be paid by Vitaphone in article 3 of the agreement had been paid, including the royalty arising out of the payment to Vitaphone from the defendant herein for sound records supplied to the defendant and used on the alleged infringing apparatus.

Defendant urges that, in consequence of these agreements and the receipt of payment with knowledge of the defendant's use, the plaintiffs are estopped from asserting that the defendant's reproduction of records lawfully made and distributed is unlawful and wrong. I confess I have great difficulty in following this argument, nor can I see the pertinency of the reference to Robinson on Patents, volume 3, § 917, page 88. That passage reads: "A patentee who acquiesces in the practice of his invention by another person, receiving compensation or the promise of compensation therefor, or looking to a different source for his reward, cannot thereafter deny the right of such other person to practice the invention in the manner and to the extent established by this actual enjoyment."

To make the foregoing passage applicable to the circumstances of this license agreement begs the question. There is no proof herein of acquiescence by the plaintiffs in the practice of the inventions in suit by the defendant.

Nor was the conduct of the plaintiffs such as is referred to in the passage of Robinson on Patents, volume 2, § 834, page 641, also cited by the defendant. The plaintiffs certainly did not induce the defendant, by the license in question, to infringe plaintiffs' patents. It is one thing to say that the Products Company was concerned with faithful reproduction of these sound records, but quite another to assert that such consideration was its only concern. The terms of the license to producers cannot spell out a license to use the plaintiffs' reproducing equipment. One cannot, of course, read the license agreement

and its amendments without being convinced that the Products Company was greatly concerned with the matter of quality of reproduction. The contract was made at a time when commercial sound moving picture reproduction was in its infancy. The Western Electric Company had faith in its own reproducing equipment and in the growth of the industry. Therefore, the interests of the plaintiffs were dependent in large measure upon effective reproducing means. Mechanism or apparatus which fell short of the standard set by the Western Electric Company might well have alienated a public which it sought to educate to the merits of sound moving picture reproduction as against the silent picture of the prior art.

With those considerations in mind, it is inconceivable that the license agreement in question purported, by the paragraphs that have been referred to, to do ought but guard against unfaithful reproduction. To assert that an exhibitor, purchasing or leasing records lawfully, is also free to infringe letters patent owned or controlled by the plaintiffs or any of them, is, in my judgment, a complete non sequitur.

Plaintiffs may have a decree in conformity with the foregoing opinion.

If this opinion is not in sufficient compliance with the rule requiring findings of fact and conclusions of law, submit findings of fact and conclusions of law in accordance therewith.